STATE *ex rel.* DR. N. H. DYER, *et al.*

*v.*

EDGAR B. SIMS, *Auditor*

(No. 10254)

Submitted February 14, 1950. Decided April 4, 1950.

RILEY, JUDGE, and GIVEN, JUDGE, dissenting.

*John W. Daniel, Leonard A. Weakley, William C. Marland,* Attorney General, *Thomas J. Gillooly,* Assistant Attorney General, for petitioners.

*Charles C. Wise,* for respondent.

Fox, JUDGE:

The Legislature of this State, at its 1949 Session, made an appropriation of $12,250.00 as a contribution to the Ohio River Valley Water Sanitation Commission for each of the two fiscal years, beginning July 1, 1949 and July 1, 1950. A requisition to make such appropriation effective for the current fiscal year was made upon Edgar B. Sims, Auditor of the State of West Virginia, and refused by him. This proceeding in mandamus is instituted in this Court to compel the said auditor to honor the requisition so made.

This proceeding was instituted by the State of West Virginia, at the relation of Dr. N. H. Dyer and W. W. Jennings, commissioners for the State of West Virginia to the Ohio River Valley Water Sanitation Commission; D. Jackson Savage, Chairman of the State Water Commission of West Virginia; and Dr. N. H. Dyer, W. W. Jennings, Dan B. Fleming and Dr. C. F. McClintic, members of the State Water Commission.

The State Water Commission of the State of West Virginia was created by Chapter 14, Acts of the Legislature, 1929, and by that Act it was provided that such commission should consist of the Commissioner of Health, the Chairman of the Public Service Commission of West Virginia, and the Chairman of the West Virginia Game and Fish Commission, and their successors in office. The Act was amended by Chapter 6, Acts of the Legislature, Regular Session, 1933; by Chapter 102, Acts of the Legislature, Regular Session, 1945, by which it was provided that the State Water Commission should consist of the Commissioner of Health, the Chairman of the West Virginia Game and Fish Commission, and their successors in office, and

three others to be appointed by the Governor with the advice and consent of the Senate; and further amended, in respect to the definitions contained in Section 1 of the original Act, by Chapter 126, Acts of the Legislature, Regular Session, 1947. Therefore, the State Water Commission, at the date of the institution of this proceeding, was made up of its chairman, D. Jackson Savage, Dr. N. H. Dyer, State Health Commissioner, C. F. McClintic, Chairman of the West Virginia Game and Fish Commission, W. W. Jennings and Dan B. Fleming. The general purpose of the creation of the State Water Commission was to provide against the pollution of the streams of the State, and it would serve no useful purpose to further define the duties of that commission.

By reason of the geographical location of the State of West Virginia and other states, in relation to the Ohio River and its tributaries, a movement was inaugurated as early as 1929, the purpose of which was to promote a compact between the several states whose territories, in whole or in part, were drained by the Ohio River and its tributaries, for the purpose of the abatement and prevention of the pollution thereof. As a result of this movement, what is termed the Ohio River Valley Water Sanitation Compact was prepared for execution by the respective states. The approval of the Congress of the United States, as required by Section 10 of Article I of the Constitution of the United States, was later obtained. To make effective this compact on the part of the State of West Virginia, the Legislature of said State, by Chapter 38, Acts of the Legislature, 1939, enacted a statute, Section 1 of which reads:

> "The following Ohio River Valley Water Sanitation Compact, which has been negotiated by representatives of the states of Illinois, Indiana, Kentucky, New York, Ohio, Pennsylvania, Tennessee and West Virginia, is hereby approved, ratified, adopted, enacted into law, and entered into by the State of West Virginia as a party thereto and signatory state, namely: * * *"

Then followed the proposed compact in full. It was pro-

vided by the Act aforesaid that the same should take effect and become operative, and the compact to be executed for and on behalf of the State of West Virginia only from and after the approval, ratification, adoption and entering into by the States of New York, Pennsylvania, Ohio and Virginia. It appears from relators' petition filed herein that the said compact was duly executed, by the states last mentioned above and others, on June 30, 1948, and that it had theretofore received the consent of the Congress of the United States to the execution thereof, the form of the compact apparently having been presented to the Congress in advance of its execution by the states.

Section 2 of Chapter 38, Acts of the Legislature, 1939, aforesaid, provides that there should be three members of the Ohio River Valley Water Sanitation Commission from the State of West Virginia, and that the Governor, by and with the advice and consent of the Senate, should appoint two persons as two of such commissioners, each of whom should be a resident and citizen of this State. It then provided that one of the three commissioners from this State should be the Commissioner of Health ex officio, and his successor in office.

Section 3 of the Act provided that:

"There is hereby granted to the commission and commissioners thereof all the powers provided for in the said compact and all the powers necessary or incidental to the carrying out of said compact in every particular. * * *

"The circuit courts of this State are hereby granted the jurisdiction specified in article nine of said compact, and the attorney general or any other law-enforcing officer of this state is hereby granted the power to institute any action for the enforcement of the orders of the commission as specified in said article nine of the compact."

By Section 5 of the Act it is provided:

"* * * There shall be appropriated to the commission out of any moneys in the state treasury unexpended and available therefor, and not otherwise appropriated, such sums as may be necessary

for the uses and purposes of the commission in carrying out the provisions of this act and the payment of the proper proportion of the state of West Virginia of the annual budget of the 'Ohio River Valley Water Sanitation Commission' in accordance with article ten of said compact."

It will appear from the foregoing quotations that reference must be had to the terms of the compact proposed to be entered into under the statute aforesaid. The purpose of the compact is stated to be the abatement and control of pollution in said river and its tributaries. Article 1 of the Act pledges each of the signatory states to faithful cooperation in control of future pollution, and in the abatement of existing pollution from the rivers, streams and waters of the Ohio River basin which flow through, into or border on any of such signatory states; and to make effective such purposes, agreed to enact necessary legislation to enable each such state to place and maintain the waters of said basin in a satisfactory sanitary condition, available for safe and satisfactory use as public and industrial water supplies after reasonable treatment, and suitable for recreational usage, capable of maintaining fish and other aquatic life, free from unsightly or malodorous nuisances due to floating solids or sludge deposits, and adaptable to such other uses as might be legitimate. Article IV provides that the commission should consist of three commissioners from each state to be selected as the laws of such state might provide, and three commissioners representing the United States to be appointed by the President of the United States, or in such other manner as might be provided by the Congress. Article V provides for the election of a chairman of the commission; for the employment of necessary legal and clerical assistance; requires an annual report by the commission of its activities to the governor of each state, and the submission to such governor of a proposed budget of expenditures; requires the keeping of an accurate account of receipts and disbursements; prohibits the commission from incurring any obligation of any kind prior to the making of an adequate appropriation to meet the same; and prohibits

the pledging of the credit of any signatory state except. by and with the authority of the Legislature thereof.

Article VI of the compact provides, among other things, that:

"All sewage from municipalities or other political subdivision, public or private institutions, or corporations, discharged or permitted to flow into these portions of the Ohio River and its tributary waters which form boundaries between, or are contiguous to, two or more signatory States, or which flow from one signatory State into another signatory State, shall be so treated, within a time reasonable for the construction of the necessary works, as to provide for substantially complete removal of settleable solids, and the removal of not less than forty-five per cent (45%) of the total suspended solids; provided that, in order to protect the public health or to preserve the waters for other legitimate purposes, including those specified in Article I, in specific instances such higher degree of treatment shall be used as may be determined to be necessary by the Commission after investigation, due notice and hearing.

. "All industrial wastes discharged or permitted to flow into the aforesaid waters shall be modified or treated, within a time reasonable for the construction of the necessary works, in order to protect the public health or to preserve the waters for other legitimate purposes, including those specified in Article I, to such degree as may be determined to be necessary by the Commission after investigation, due notice and hearing.

"All sewage or industrial wastes discharged or permitted to flow into tributaries of the aforesaid waters situated wholly within one State shall be treated to that extent, if any, which may be necessary to maintain such waters in a sanitary and satisfactory condition at least equal to the condition of the waters of the interstate stream immediately above the confluence.

"The Commission is hereby authorized to adopt, prescribe and promulgate rules, regulations and standards for administering and enforcing the provisions of this article."

Article IX of the compact provides:

"The Commission may from time to time, after investigation and after a hearing, issue an order or orders upon any municipality, corporation, person, or other entity discharging sewage or industrial waste into the Ohio River or any other river, stream or water, any part of which constitutes any part of the boundary line between any two or more of the signatory States, or into any stream any part of which flows from any portion of one signatory State through any portion of another signatory State. Any such order or orders may prescribe the date on or before which such discharge shall be wholly or partially discontinued, modified or treated or otherwise disposed of. The Commission shall give reasonable notice of the time and place of the hearing to the municipality, corporation or other entity against which such order is proposed. No such order shall go into effect unless and until it receives the assent of at least a majority of the commissioners from each of not less than a majority of the signatory States; and no such order upon a municipality, corporation, person or entity in any State shall go into effect unless and until it receives the assent of not less than a majority of the Commissioners from such State.

"It shall be the duty of the municipality, corporation, person or other entity to comply with any such order issued against it or him by the Commission, and any court of general jurisdiction or any United States district court in any of the signatory States shall have the jurisdiction, by mandamus, injunction, specific performance or other form of remedy, to enforce any such order against any municipality, corporation or other entity domiciled or located within such State or whose discharge of the waste takes place within or adjoining such State, or against any employee, department or subdivision of such municipality, corporation, person or other entity; provided, however, such court may review the order and affirm, reverse or modify the same upon any of the grounds customarily applicable in proceedings for court review of administrative decisions. The Commission or, at its request, the Attorney General or other law enforcing official, shall have

power to institute in such court any action for the enforcement of such order."

This proceeding was instituted by the relators by filing their petition herein on January 24, 1950. A rule to show cause why the writ prayed for should not issue was awarded thereon, returnable on February 14, 1950. On the return day of the rule, respondent, Edgar B. Sims, Auditor, filed his demurrer to the petition of the relators, assigning numerous grounds, the substance of which will be referred to and discussed in this opinion. Respondent also filed his answer which does not raise any question of fact. The proceeding was argued orally and by briefs, and was submitted on relators' petition and respondent's demurrer and answer thereto.

The sole question to be determined in this proceeding is the power of the Legislature of this State to enact Chapter 38, Acts of the Legislature, 1939. The appropriation under attack must necessarily depend upon the validity of the said Act from the standpoint of legislative power. We are not here concerned with any question of policy, for, admittedly, that question rests with the Legislature, and its determination is not the proper function of the judicial department of the State government. If the Legislature did not have power to make the enactment, the appropriation in question must fall. If it possessed such power, then the policy involved in the appropriation, and the amount thereof, was, for all practical purposes, within the exclusive jurisdiction of the Legislature.

The validity of the Act is attacked on four grounds: (1) The title of the Act fails to properly define the purpose thereof; (2) the appropriation involved was not for a public purpose; (3) it violates Sections 3, 4 and 6 of Article X of the Constitution of this State; and (4) the Legislature was without power to delegate to persons and agencies, outside the State, and beyond the control of the Legislature, the police powers of the State. We shall consider these points of attack in the order stated.

Section 30 of Article VI of the Constitution of this State provides that:

"No act hereafter passed shall embrace more than one object, and that shall be expressed in the title. * * *"

The title of the Act here in question reads as follows:

"An act approving, ratifying and enacting into law the 'Ohio River Valley Water Sanitation Compact' for the prevention, abatement and control of pollution of the rivers, streams and waters in the Ohio river drainage basin and making the state of West Virginia a party thereto; creating the 'Ohio River Valley Water Sanitation Commission'; providing for the members of such commission from the state of West Virginia; and providing for the carrying out of said compact."

The attack on said title is limited to the last phrase "and providing for the carrying out of said compact." It is contended that the language employed is insufficient to furnish an index of what the Act contains with respect to the carrying out of the compact authorized thereby.

That part of Section 30, Article VI of our Constitution, quoted above, should be interpreted in a practical way. The clear purpose of the constitutional provision was to avoid having the purpose of a legislative enactment concealed in any way by the failure to state that purpose in the title of the Act. Generally speaking, every Act of a Legislature calls for some provision for its enforcement, and we think the rule to be general that the details of the means employed to enforce the Act need not be stated with any particularity in the title thereto. It is sufficient if in the title it is stated that the Act contains provisions for carrying it into effect. In *Sypolt* v. *Shaffer,* 130 W. Va. 310, 43 S. E. (2d) 235, in the body of the opinion, we said:

"All titles can be elaborated and many improved. However, the test of their sufficiency is whether they will convey to persons interested in the actual subject matter enough information to provoke the reading of the act, and will also properly restrict the purpose of the act to a single topic."

See also *City of Wheeling* v. *American Casualty Co.,* 131 W. Va. 584, 48 S. E. (2d) 404. In the case at bar, we are

permitted to take judicial notice of the provisions of Chapter 38, Acts of the Legislature, 1939, which incorporates in full the compact thereby enacted into law. That compact clearly sets out the purpose thereof, and the methods by which it may be made effective; and the Act itself, by Section 3 thereof, grants to the Sanitation Commission all the powers mentioned in the compact, and by Section 5 provides for the appropriation of moneys as a contribution of the share of this State in the carrying out of the purposes of the compact. In our opinion, the title of the Act sufficiently states the purpose thereof.

The second point of the attack is that relators' petition does not allege that the appropriation was made for a public purpose. Having the Act and the compact before us, we think it clearly appears that the purpose sought to be effected by the organization of the Sanitation Commission, and the appropriation of public funds to meet West Virginia's share of the expense thereof, was for a public purpose, being, among other things, the preservation of the purity of our streams, and the guarding against danger to the health of the citizens of the State, and well within the police power of the State. We have no difficulty in holding that the appropriation made, if otherwise valid, was for a public purpose.

The third point of attack involved, Sections 3, 4 and 6 of Article X of the Constitution of this State. Section 3 provides that:

"No money shall be drawn from the treasury but in pursuance of an appropriation made by law, and on a warrant issued thereon by the Auditor; nor shall any money or fund be taken for any other purpose than that for which it has been or may be appropriated or provided. A complete and detailed statement of the receipts and expenditures of the public monies shall be published annually."

Section 4 reads:

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to re-

deem a previous liability of the State; to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at lease twenty years."

Section 6 provides:

"The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever."

Assuming the Act to be otherwise valid, we do not think that Sections 3 or 6 of Article X of our Constitution, quoted above, would make it invalid. Section 3 merely provides how money shall be drawn from the State Treasury, and requires an accounting. Treating the Act and the compact as one enactment, we think an accounting is provided for; and, necessarily, the appropriation cannot be withdrawn from the treasury except on warrant issued by the auditor. That procedure has been provided for in this instance. The purpose of Section 6 of Article X was to guard against the granting of the credit of the State in aid of any county, city, township, corporation or person, or the assumption of their debts or liabilities; and against the State becoming a joint owner or stockholder in any company or association. In our judgment, the proposed Act does not violate this section. The purposes of the section are well known, being to guard against the mistakes of the mother Commonwealth of Virginia in granting aid to counties, and particularly in granting aid to organizations for the purposes of so-called public improvements, and in becoming stockholders of such organizations. It was not, we think, intended to inhibit the use of the State's funds in carrying out public purposes such as, we think, the clearing of our streams from pollution. We do not think it inhibits the organization of public corporations for the purpose of

carrying out governmental purposes. *Sims* v. *Fisher*, 125 W. Va. 512, 25 S. E. (2d) 116.

The provisions of Section 4 of Article X, aforesaid, raises a more serious question. In effect, it provides that no debt shall be contracted by the State except to meet casual deficits and other specified situations. Ordinarily, the creation of a State board or commission which requires an appropriation of public funds to carry out its purposes is not treated as the creation of a debt, although its generally contemplated continuation from year to year, and for an indefinite period, must necessarily involve future appropriations. Practically all agencies created by the Legislature require appropriations from time to time, and that was necessarily contemplated at the time they were created.

But the Act before us involves an entirely different situation. We are here dealing with a compact between sovereign states and the Federal Government, treated as a contract which the Supreme Court of the United States, in a suit between states has power to enforce. If the compact creating the Ohio River Valley Water Sanitation Commission be upheld, then it creates what is in legal effect a contract binding on all the parties thereto, the obligation of which continues so long as that contract exists. Many cases might be cited, upholding the power of the Supreme Court of the United States to enforce such a compact, among which are *Green* v. *Biddle*, 8 Wheaton 1, 5 L. Ed. 547; *Pennsylvania* v. *Wheeling Bridge Co.*, 13 Howard 518, 14 L. Ed. 249; *Olin* v. *Kitzmiller*, 259 U. S. 260, 66 L. Ed. 930; *Dartmouth College* v. *Woodward*, 4 Wheaton 518, 4 L. Ed. 629; *Richmonds, etc. Railroad Co.* v. *Louisa, etc. Railroad Co.*, 13 Howard 71, 14 L. Ed. 55; *Virginia* v. *West Virginia*, 246 U. S. 565, 62 L. Ed. 883.

Treating the compact enacted into law by Chapter 38, Acts of the Legislature, 1939, as valid and enforceable, the question arises whether by entering into the same the Legislature did not bind itself to make future appropriations for its enforcement, and thereby create an obligation or debt binding upon future Legislatures.

In this connection, it may be well to discuss some general principles involving the power of the Legislature as one of the three branches of our State government. As everyone knows, when the Declaration of Independence was adopted each of the thirteen colonies became sovereign and independent states, possessing all of the powers necessary to the government of the people residing therein, and including what is known as police power of the State. That power still rests in the states, except to the extent that it has been delegated to the Federal Government by the original Constitution of the United States, or the Amendments thereto. It is generally assumed that the states did not, by the delegation of powers to the Federal Government, limit themselves in respect to the police power they then possessed; but from a practical standpoint, it cannot be denied that in the delegation of powers to the Federal Government some of the police powers of the states were included as incidental to the powers delegated. There was, of course, no specific delegation of police power by the states to the Federal Government.

All this being true, the states, being vested with the police power, adopted Constitutions which operated as a restraint of power and not a grant of power. *Strawberry Hill Land Corp.* v. *Starbuck,* 124 Va. 71, 97 S. E. 362; *City of Richmond* v. *Virginia Railway & Power Co.,* 141 Va. 69, 126 S. E. 353; *Mumpower* v. *Housing Authority,* 176 Va. 426, 11 S. E. (2d) 732.

In this State, it is provided that by Section 1 of Article VI of our Constitution that:

> "The legislative power shall be vested in a Senate and House of Delegates. * * *"

So that with us all legislative power is vested in the Legislature. But it is not an absolute or unlimited power, because under our theory of government, which recognizes that all power rests in the people, there are certain rules which even a Legislature with its vast legislative power cannot transgress. To illustrate: A Legislature does not

possess power to collect revenues or expend the same except for a public purpose; it cannot bind the action of future Legislatures; it cannot grant, delegate or barter in perpetuity the police power of the State. These restrictions are not constitutional. There is nothing in our State Constitution which inhibits such actions; but they are, nevertheless, as much a part of the restraints upon the Legislature as if they were specifically inhibited by the Constitution in express terms. This question was discussed by Judge Cooley in 1 Cooley's Constitutional Limitations (8th Ed.) 436, where it is stated:

> "Equally incumbent upon the State legislature and these municipal bodies is the restriction that they shall adopt no irrepealable legislation. No legislative body can so part with its powers by any proceeding as not to be able to continue the exercise of them. It can and should exercise them again and again, as often as the public interests require. Such a body has no power, even by contract, to control and embarrass its legislative powers and duties. * * *"

In 11 Am. Jur. 983, it is stated:

> "It is a fundamental principle of constitutional law that in matters relating to the police power each successive legislature is of equal authority. A legislative body cannot part with its right to exercise such power; it inherently has authority to use the power again and again, as often as the public interests may require. Hence, one session or body of the legislature may not by any contract with an individual restrain the power of a subsequent legislature to legislate for the public welfare. The governmental power of self-protection cannot be contracted away. Neither can the exercise of rights granted nor the use of property be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury.
>
> "The foregoing principles are embodied in the familiar rule that the state cannot barter or bargain away the right to use the police power or by any contract divest itself of the power to provide

for acknowledged objects of legislation falling within the domain of the police power. Accordingly, the legislature cannot surrender or limit such powers, either by affirmative action or by inaction, or abridge them by any grant, contract, or delegation whatsoever. In some states it is specifically provided in the state Constitutions that the exercise of the power may never be abridged."

In 16 Corpus Juris Secundum 549, it is stated:

"The police power of the state cannot be alienated, surrendered, or abridged in any manner whatsoever by the legislature or other agency exercising such power."

In *Laurel Fork & Sand Hill Railroad Co.* v. *West Va. Transportation Co.*, 25 W. Va. 324, this Court held:

"Irrevocable grants of franchises to corporations, which impair the supreme authority of the State to make laws for the right government of the State, must be regarded as mere licenses and not as contracts, which bind future legislatures; for no legislature can give away or sell the discretion of subsequent legislatures in respect to matters, the governing of which from the very nature of things must vary in varying circumstances."

See also 4 Michie Jur. 169 and cases there cited.

As stated above, the thirteen colonies existing at the date of the Declaration of Independence became independent and sovereign states, and the states which have been since admitted into the Union, under the Constitution, are likewise independent and sovereign states, but all are subject to the powers delegated to the Federal Government by the original Federal Constitution, and the Amendments thereto adopted from time to time. After the adoption of our Constitution, any one of the thirteen states could have entered into a compact with another without any interference on the part of the remainder of the other states. However, when our Federal

Constitution was adopted, it was provided by Section 10 of Article I thereof that:

> "No State shall, without the Consent of Congress * * * enter into any Agreement or Compact with another State, * * *."

This provision, of course, recognized the right of the State to enter into compacts with other states, with the consent of the Federal Government, which could only be effected by an Act of Congress. This recognition of the right to make such compacts between states furnishes the basis for the jurisdiction of the Federal courts should a controversy arise between two or more states, as provided by Section 2 of Article III of the Constitution of the United States, by which Section it is also provided that in controversies to which a state shall be a party, the Supreme Court of the United States shall have original jurisdiction. All this being true, we are driven to the conclusion that if the challenged act and compact be upheld, the Legislature has, in all reasonable probability, bound future Legislatures to make appropriations for the continuation of the activities of the Sanitation Commission, and this, we think, amounts to the creation of a debt inhibited by Section 4 of Article X of our State Constitution.

The final, and, as we view it, the most important question raised on this record, relates to the power of the Legislature to delegate to the Ohio River Valley Water Sanitation Commission a part of the police power of the State. We think a reading of the compact creating such commission will disclose that this State has delegated and vested in such commission, in perpetuity, a substantial part of its police power, so far as that power relates to the control of our streams, which power may be exercised by the said commission as a whole, and by which, with one exception to be hereafter noted, can if so desired be controlled and used by commissioners from other states in conjunction with commissioners appointed by the Federal Government.

One of the best definitions of the police power of the State is found in 11 Am. Jur. 966, where it is stated:

"The police power is an attribute of sovereignty and a necessary attribute of every civilized government. It is a general term used to express the particular right of a government which is inherent in every sovereignty. Consequently, it is inherent in the states of the American Union, possessed by every one of them as sovereign, and is not a grant derived from or under any written Constitution. In connection with this latter principle, the point of view has been expressed that the police power is a grant from the people to their governmental agents. It has also been affirmed, however, in discussing the source of the power, that the right of the legislature to exercise the police power is not only not referable to any single provision of the Constitution, but inheres in, and springs from, the nature of our institutions; and so the limitations upon it are those which spring from the same source, as well as those expressly set out in the Constitution. It is very generally regarded not as a delegated, but a reserved, power."

In 2 Cooley's Constitutional Limitations (8th Ed.) 1223, it is stated:

"The police of a State, in a comprehensive sense, embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order and to prevent offenses against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others."

And it is defined by Blackstone as "the due regulation and domestic order of the Kingdom, whereby the inhabitants of a State, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations." 4 Bl. Com. 162.

As stated above, under our system of government, the police power has always been vested in the states, and was not, in terms, delegated by them to the Federal Government under the Constitution of the United States, although, undoubtedly, the Federal Government does exercise police power in the carrying out of powers delegated to it under the Federal Constitution. The police power, not owing its force to any constitutional provision, being of a nature necessary to be exercised by all civilized governments, must stand above Constitutions and beyond the encroachments of legislative power. By common sense and necessity, the use of the police power of the State is vested in that branch of the government through which the people speak, namely, the Legislature; but it is a power, which, being within legislative control, cannot be permanently bartered away or alienated by any one Legislature. It is a power which must always remain in existence, and subject to legislative use when necessity arises. This being true, when a Legislature undertakes to delegate to any citizen, any municipality, or any other agency of the government inside the State, in perpetuity, or attempts to make a compact with another state or states, or with the Federal Government, by which it so delegates a part of its police power to be used within this state or outside this state, it attempts to do something which it does not possess the power to do. While it possesses the power to delegate the police power to governmental agencies within the State, it does not, in our opinion, possess the power to delegate any portion of that power to another state or to the Federal Government or to a combination of the two. We say this for two reasons: (1) The Legislature of the State of West Virginia has no extra-territorial power, and its attempted transfer of a part of the police power of the State vested in it is void and of no effect, as the power to delegate such police power is one which can only be exercised within this State; and (2) when exercising the police power within this State, it cannot be so delegated as to place it beyond the power of future Legislatures to withdraw such delegation at its will and pleasure. The authorities herein-

before cited and discussed stress the point that the police power is something which must be always available for the use of the people, as represented by the Legislature. Any other interpretation of legislative power in respect thereto is unthinkable.

It is true that under the provisions of Article IX of the proposed compact it is provided that the order therein authorized to be made should not go into effect until it received the assent of at least a majority of the commissioners of at least a majority of the signatory states; and that no such order upon a municipality, corporation or person in any State should go into effect until it received the assent of not less than a majority of the commissioners from such state. This, in effect, provides that commissioners of any state may veto any proposed project within their state. This provision is not sufficient to take the act out of the inhibitions to which we have referred above. The authority to approve the project is delegated, and whether the same shall be vetoed depends upon the judgment of the commissioners who may be in office at the time the project is proposed and ordered.

Here we have a most worthy enterprise, that of guarding against the pollution of our streams, and providing for the safety and health of our people by the restoration of our streams, to some extent, to their original purety, and adding to the joy of living by people who desire to take their recreation among the forests and streams of our State and neighboring states. We realize that in this instance the purpose in view can only be worked out through cooperation between the states drained in whole or in part by the Ohio River and its tributaries. We would not be understood as desiring to stand in the way of such cooperation; but it must be such cooperation as does not surrender or barter away the rights of this State as one of the sovereign states of the Union. The police power must always be at the call of our Legislature to be used by it, or delegated to agencies of the government, to meet public emergencies as they arise. We cannot in safety surrender any part of that power to the Federal Govern-

ment or to other states. To the extent that such power can be reserved to us within our borders, we can and probably should cooperate in the purposes which the Ohio River Valley Water Sanitation Commission was designed to promote. But the proposed legislation goes too far, and surrenders too much. The Legislature of this State did not posses the power to authorize the compact here involved, and so far as this State is concerned the same is null and void. That being true, there was no basis for the appropriation, the payment of which is sought to be enforced in this proceeding. It follows that the writ must be denied.

*Writ denied.*

GIVEN, JUDGE, dissenting:

State compacts are in authority based on Clause 3 of Section 10 of Article I of the Federal Constitution, which reads: "No State shall, without the Consent of Congress, * * * enter into any Agreement or Compact with another State, * * *." Such compacts are now so embedded in our form of government as to constitute an essential part thereof. The compact under consideration affords a clear example of the necessity for such compacts. It proposes to operate in a field necessary for the health and general welfare of the people, wherein the Federal government has not acted, and possibly cannot act at this time, and wherein it is impossible for the individual states to operate efficiently or successfully because of territorial limitations. Such compacts are not unusual. They have served well in fields of irrigation, conservation, boundary line disputes and many others. See Compact Clause of the Constitution, 34 Yale Law Journal 685; Interstate Compacts, 70 U. S. Law Review 557. For these reasons, and because of well established applicable principles of law, which need no citation of authority, the legislation under consideration, which includes the compact, should be liberally construed to save its constitutionality.

The majority opinion, as I understand it, concedes the necessity for such a compact, and that the accomplishment

of the purposes of such a compact may be best obtained by joint action of the several states concerned. It also concedes the constitutionality of the compact under consideration except in the two respects hereinafter considered. As early as 1929, those believing such a compact necessary for proper action, looking toward the purification of the waters of the Ohio River and its tributaries, for protection of the health and for the general welfare of the people of the states concerned, were engaged in an effort to obtain the adoption of a workable compact. After years of study and effort by representatives of the several states concerned and of the Federal government, a compact was designed which was believed would be practicable and workable under the Constitutions of the several states. After further consideration and study, with possibly some minor changes, the compact in its present form was approved by the Congress of the United States in accordance with the provisions of Section 10, Article I of the Federal Constitution. Representatives of the several states concerned, by authority of their respective legislatures, have executed the compact, so that it is now in force and effect in so far as the powers of the states and the Federal government can make it so.

The Court now holds this compact unconstitutional for the reasons that the Legislature has exceeded its power in the delegation of police powers, and that the act of the Legislature adopting the compact, Chapter 38, Acts of the Legislature, Regular Session, 1939, attempts to bind future Legislatures of this State, in perpetuity, in the exercise of its police powers, and as to making appropriations in aid of carrying out the purposes of the compact. Thus, this State is placed in the unenviable position of being unable to become a member of such a compact.

Does the compact in effect bind in any manner future Legislatures of this State, or does the compact grant any power or right in perpetuity? Article VII of the compact provides: "Nothing in this compact shall be construed to limit the powers of any signatory State, * * *." In the face of this clear reservation to "any signatory State" of

the "powers" of such state, I cannot believe that the intention to grant, in perpetuity, any power whether the police power or the power to make appropriations, can be read into the compact. The plain meaning of the language seems to be that the compact shall be so construed that no limit shall be placed upon any power of any signatory state as to any future action thereof. If this be correct, then there is no granting of any police power or any other power, in perpetuity, and no future Legislature is bound or attempted to be bound as to any such police power or as to the making of any future appropriation.

A further argument of the majority in support of the unconstitutionality of the compact is that the delegation of police power of the State cannot be made to some agency or commission set up in conjunction with other states. This doctrine would practically close the doors of this State to participation in any compact with any other state where the compact could not be made operative without aid of the police power. The compact here, however, restricts the use of the police power of the State to the authorized representatives of this State, the members of the commission appointed by this State, residents of this State, responsible only to the authority of this State and subject to removal as such commissioners by the Governor of this State. The only possible use of the police power granted to the commission would be in connection with the enforcement of orders of the commission as provided for in Article IX of the Compact. After proper investigation and hearing, the commission could issue orders requiring municipalities or persons to conform as to the disposition of sewage. In that article is found this limitation on the use or exercise of the power delegated: "No such order shall go into effect unless and until it receives the assent of at least a majority of the commissioners from each of not less than a majority of the signatory States; and no such order upon a municipality, corporation, person or entity in any State shall go into effect unless and until it receives the assent of not less than a majority of the Commissioners from such State." Thus, it will be seen

that the compact itself vests in the commissioners representing this State, as such commissioners and not as individuals, the sole and absolute power to exercise and control the police power delegated. That power is not to be, and in the nature of things cannot be, exercised beyond the territorial limits of this State, and only courts within the jurisdiction of this State would have original jurisdiction in proceedings to enforce such orders. This being true, there could be no unlawful use or any unconstitutional delegation of any police power of this State. No language in the compact or the act can be construed to "grant" or perpetually "alienate" any police power. That intent is read into the legislation by the majority of the Court from the results which they believe will be brought about by the operation of the compact.

Does the act of which the compact is a part "create a debt" or bind future Legislatures to make appropriations? The majority opinion says yes; the compact says: "The Commission shall not incur any obligations of any kind prior to the making of appropriations adequate to meet the same; nor shall the Commission pledge the credit of any of the signatory States, except by and with the authority of the legislature thereof." (Last clause, Article V.) In the face of this very emphatic command that the commissioners shall "not incur any obligation of any kind", the majority of this Court holds the act void "as creating a debt". But the authors of the compact, being zealous of making the compact conform to the provisions of the Constitution, made further provision in the compact to the effect that "the credit" of any state should not be pledged "except with the authority of the legislature thereof." It is believed that any reading of this provision should force one to the conclusion that no debt can be incurred by the commission until the Legislature has made appropriation therefor, and that the commission cannot extend the credit of the State until authorized to do so by the Legislature existing at the time. There seems no doubt that these matters are fully reserved to future Legislatures, and that future Legislatures are left free to legislate or not to legis-

late as to such police powers, and to appropriate or not to appropriate, as to them may seem proper.

The appropriation declared invalid was intended for use of the commission in the study and survey necessary for determination of the proper and most efficient methods of purifying the waters of the Ohio River and its tributaries. This was undoubtedly in the interest of this State since proper methods should be determined before the work of purification commenced and since the work could be done at less cost for each state by joint investigation and experimentation. Therefore, there can be no question that the appropriation was for a public purpose. The majority opinion concedes this much. In the expenditure of this appropriation, there would not be involved any of the police powers of this State, and such expenditure does not call for any further appropriation by the present or any future Legislature. Such further appropriations may become advisable, but that is a question that the future alone must determine. There is here involved no actual exercise of any police power or any effort to force any future appropriation. This being true, the questions of delegation of police power, the pledge of the credit of the State, and the binding of future Legislatures, are not involved in this mandamus proceeding, and should not be decided until squarely before this Court. "A court will not pass upon the constitutionality of a statute, unless a decision upon that very point is necessary to the determination of the case." *Edgell* v. *Conaway*, 24 W. Va. 747, Point 1, Syllabus; *Shepherd* v. *Wheeling*, 30 W. Va. 479, 4 S. E. 635; *Dillon* v. *County Court*, 60 W. Va. 339, 55 S. E. 382; *Fry* v. *Ronceverte*, 93 W. Va. 388, 117 S. E. 140; *Grenada Lumber Co.* v. *Mississippi*, 217 U. S. 433, 54 L. Ed. 826, 30 S. Ct. 534. "Indeed, it is well-settled that the constitutionality of a statute will not be determined in any case, unless such determination is absolutely necessary in order to determine the merits of the suit in which the constitutionality of such statute has been drawn in question. The court will not permit these principles to be circumvented by the parties

and hence will not recognize a waiver by them of consideration of all issues other that the constitutional one.

"In accordance with these rules, constitutional questions will not be determined abstractly or in a hypothetical case, or anticipated in advance of the necessity for determination thereof, so that generally, no such consideration will be undertaken if no injury has as yet resulted from the application of the statute and no rights have been brought within its actual or threatened operation, * * *." 16 C. J. S., Constitutional Law, Section 94. To the same effect is 11 Am. Jur., Constitutional Law, Section 93.

Being of the views herein indicated, I respectfully dissent.

I am authorized to say that Judge Riley concurs in this dissent.