127 S.E.2d 122 (1962)
203 Va. 687
Robert Y. BUTTON, Attorney General of Virginia
v.
Sidney C. DAY, Jr., Comptroller of Virginia, and Lewis H. Vaden, Treasurer of Virginia.
Supreme Court of Appeals of Virginia.
August 31, 1962.
*123 Robert Y. Button, Atty. Gen., Kenneth C. Patty, Asst. Atty. Gen. (R. D. McIlwaine, III, Asst. Atty. Gen., Paul M. Shuford, Special Asst. to the Atty. Gen., on the brief), for petitioner.
Edward A. Marks, Jr., Richmond (Sands, Anderson, Marks & Clarke, Richmond, on the brief), for respondents.
Before EGGLESTON, C. J., and SPRATLEY, BUCHANAN, SNEAD, I'ANSON and CARRICO, JJ.
EGGLESTON, Chief Justice.
This is a petition filed by the Attorney General against the State Comptroller and State Treasurer invoking the original jurisdiction of this court, pursuant to Code, § 8-714, to determine the validity of Chapters *124 194 and 195 of the Acts of Assembly of 1962. The respondent officials advised the Attorney General, in writing, that they entertained doubt as to the constitutionality of these Acts and would refuse to make the disbursements and the transfer of certain assets as therein directed until ordered to do so by this court. Whereupon the present proceeding was brought by the Attorney General praying for a writ of mandamus requiring these officials to make such transfer and disbursements. The underlying facts, which are not in dispute, are found in the pleadings and a stipulation of the parties.
Chapter 194 (Acts 1962, p. 287) creates the Virginia Public School Authority, hereinafter referred to as the "Authority," as a public body corporate and a political subdivision and an agency and instrumentality of the Commonwealth. The Authority, which is to be administered by a Board of Commissioners consisting of the State Treasurer, the State Comptroller, and five additional members to be appointed by the Governor, subject to confirmation by the General Assembly, is directed and empowered to manage and administer all moneys and obligations which may be set aside and transferred to it from the principal of the Literary Fund by the General Assembly for public school purposes, pursuant to Section 134 of the Constitution of Virginia.
The stated purpose for the creation of the Authority is to facilitate and lessen the cost of financing the construction of public schools. To accomplish this purpose the Authority is empowered to purchase at public or private sale the bonds or other obligations of counties, cities and towns issued under the provisions of the Public Finance Act of 1958 (Acts 1958, ch. 640, p. 948; Code, 1960 Cum.Supp., § 15-666.13 ff.), and to pledge such bonds so purchased to secure the payment of the principal of or interest on any bonds issued by the Authority pursuant to the Act. Subject to such pledge the Authority may sell any such local school bonds so purchased and apply the proceeds to the purchase of other like local school bonds.
In order to provide funds by which the Authority may purchase local school bonds, the Board is authorized to provide by resolution for the issuance of bonds which shall be payable solely from funds of the Authority, including, but without limitation, "(i) payments of principal of and interest on local school bonds purchased by the Authority, (ii) the proceeds of the sale of any such local school bonds, (iii) payments of principal of and interest on obligations transferred to the Authority from the Literary Fund, (iv) the proceeds of the sale of any such obligations, and (v) any moneys transferred to the Authority from the Literary Fund, as shall be provided by the resolution of the Board authorizing any such bonds."
Bonds issued by the Authority shall not be deemed to constitute a debt of the Commonwealth or a pledge of the faith or credit thereof. They shall contain on their face a statement to the effect that neither the faith and credit nor the taxing power of the Commonwealth or of any political subdivision thereof is, or shall be, pledged to the payment of the principal of or the interest on such bonds.
In the discretion of the Board, any bonds issued by the Authority may be secured by a trust indenture by and between the Authority and a corporate trustee. Such trust indenture, or the resolution providing for the issuance of such bonds, may pledge or assign all or any part of the funds of the Authority available for such purpose.
Under the provisions of Chapter 195 (Acts 1962, p. 291), on July 1, 1962, and on each January first and July first thereafter, there shall be set aside and transferred to the Authority for public school purposes, to be held and administered by it as provided by law, "so much of the principal of the Literary Fund established under section one hundred and thirty-four of the Constitution as is in excess of the total of *125 (a) ten million dollars and (b) any other moneys theretofore set aside by the General Assembly under section one hundred and thirty-four of the Constitution, and the State Board of Education and the State Treasurer and the State Comptroller are hereby authorized and directed to take all necessary steps to accomplish such transfer."
In order that the Authority may carry out the purposes for which it is established, it is authorized to pay the compensation of its chief executive officer and all such employees, agents, financial advisers and attorneys as may be employed by it, either from moneys received by the Authority under the provisions of Chapter 194 or from appropriations made by the General Assembly available for such purpose.
Section 134 of the Constitution provides:
"The General Assembly shall set apart as a permanent and perpetual literary fund, the present literary fund of the State; the proceeds of all public lands donated by Congress for public free school purposes; of all escheated property; of all waste and unappropriated lands; of all property accruing to the State by forfeiture, and all fines collected for offenses committed against the State, and such other sums as the General Assembly may appropriate; provided that when and so long as the principal of the literary fund amounts to as much as ten million dollars, the General Assembly may set aside all or any part of moneys thereafter received into the principal of said fund for public school purposes including teachers retirement fund to be held and administered in such manner as may be provided by general law."[1] (Italics supplied.)
The material portion of Section 135 reads: "The General Assembly shall apply the annual interest on the literary fund; * * * to the schools of the primary and grammar grades, for the equal benefit of all the people of the State, * * *."
These constitutional provisions have been implemented by former acts of the General Assembly. Code, § 22-101, provides for the composition of the Literary Fund, its investment and management by the State Board of Education, and the dedication of the annual income derived therefrom "exclusively to the support and maintenance of public schools in this State."
Code, § 22-102, as amended, authorizes the State Board of Education to invest the capital and unappropriated income of the Literary Fund in certain securities, including the "bonds made by one or more of the county boards or city school boards of the several counties or cities of the State * * *."[2]
Under § 22-105 the State Board of Education is authorized to lend to the school boards of the several counties, cities and towns operating as separate school districts, "money belonging to the Literary Fund, and in hand for investment, for the purpose of erecting, altering or enlarging schoolhouses in such counties, cities and towns."
Section 22-112, as amended, provides that the indebtedness for such a loan shall be evidenced by bonds or notes payable to the Commonwealth of Virginia for the benefit of the Literary Fund.
The Attorney General argues that Chapters 194 and 195 of the Acts of 1962 are not antagonistic to any provision of the Constitution; that they are in furtherance of the provisions of Sections 134 and 135 in that they establish a State agency with authority to purchase local school bonds and thus create an additional market for these obligations; and that they further empower such agency to raise new working *126 capital to be loaned to the local school boards by selling or borrowing against the securities held by the Authority.
On the other hand, it is argued on behalf of the respondents that the Acts are constitutionally invalid in a number of respects.
(1) First, it is said, Section 134 of the Constitution does not permit the General Assembly to set aside, as Chapter 195 attempts to do, any part of the principal of the Literary Fund received therein prior to the effective date of the legislation.
As originally written, the first portion of Section 134 of the Constitution directed the General Assembly to "set apart as a permanent and perpetual literary fund" certain specified items. By the amendment ratified in 1944, this language was added to the section: "provided that when and so long as the principal of the literary fund amounts to as much as ten million dollars, the General Assembly may set aside all or any part of moneys thereafter received into the principal of said fund for public school purposes including teachers retirement fund to be held and administered in such manner as may be provided by general law."
The Attorney General contends that it is the purpose of this amendment to maintain in the Literary Fund the principal amount of $10,000,000, and that any portion of the principal in excess of this amount may be "set aside" and devoted by the General Assembly for public school purposes, including teachers' retirement fund, to be held and administered as may be provided by general law, and that Chapters 195 and 194 implement this amendment and are in furtherance of its purposes. He argues that this is apparent from the language, "when and so long as the principal" amounts to $10,000,000 the General Assembly may set aside all or any part of the moneys "thereafter received into the principal of said fund." Thus, he contends that the word "thereafter" refers to and modifies the phrase "when and so long as" the principal of the fund amounts to $10,000,000.
It is argued on behalf of the respondents that the word "thereafter" properly refers to the words "set aside;" that it is the purpose of the language of the amendment to permit the General Assembly to refrain from allocating funds to the principal of the Literary Fund, but that when the moneys have been paid into the principal of the fund they must remain there and cannot be set aside as the basis for loans for capital or permanent school purposes.
The Attorney General replies that the language of the amendment negatives the intention that the principal of the fund shall remain inviolate, as the respondents argue, because he says that beyond the specified maximum the General Assembly "may set aside all or any part of the moneys thereafter received into the principal of said fund." (Emphasis added.)
We agree with the reasoning of the Attorney General. Indeed, it is in accord with our conclusion in Almond v. Gilmer, 188 Va. 1, 15, 49 S.E.2d 431, 439, that by this amendment the General Assembly was "empowered to use the principal so long as it was not reduced below ten million dollars."
(2) Next, it is said that the use of the principal of the Literary Fund in the manner specified in Chapter 194 is not for public school purposes as is required by Section 134 of the Constitution.
It is not questioned that the use by the Authority of funds to purchase local school bonds is for public school purposes. But the brief on behalf of the respondents questions the use of such funds (1) as collateral security for bonds which the Authority may issue and sell in order to provide additional capital for its use, and (2) to meet the payroll requirements of the Authority. These *127 uses, it is argued, are not for public school purposes. We do not agree with that position.
The plain object of Chapter 194 is to implement the purposes of Sections 134 and 135 of the Constitution and aid in the construction of public schools. Neither of these sections spells out the method by which this aid is to be effected. Section 134 merely provides that the moneys received from the principal of the Literary Fund for public school purposes are "to be held and administered in such manner as may be provided by general law." Chapter 194 provides the method in which such funds are to be administered and applied to the constitutional purposes. It grants to the Authority, among others, the right and power to administer the assets transferred to it in such a way as to increase the capital fund which may be loaned for school purposes. Clearly this does not run counter to the terms of these constitutional provisions. Indeed, the plan is in furtherance of the underlying purposes of Sections 134 and 135. Similarly, the payment of reasonable administrative expenses is incidental to and in furtherance of the underlying purposes of the constitutional provisions.
(3) For like reasons, we hold that the use of the annual interest for the purposes set forth in Chapter 194, that is, as collateral security for bonds issued by the Authority and to meet its administrative expenses, is not contrary to the provisions of Section 135 of the Constitution but is in furtherance thereof.
(4) Section 185 of the Constitution provides that, "Neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation, * * *." It is argued on behalf of the respondents that the provision in Chapter 194 authorizing the Authority to pledge the local school bonds to be acquired by it as collateral security for bonds issued by the Authority constitutes a lending of the credit of the county, city, or town issuing such school bonds in violation of this constitutional prohibition. We hold that it does not.
We need not stop to inquire whether the pledging of these bonds by the Authority constitutes a lending of the credit of the obligors within the meaning of this constitutional provision. In Almond v. Day, 197 Va. 782, 786, 787, 788, 91 S.E.2d 660, 664, 665, we pointed out that the purpose of this provision is to protect the State and its political subdivisions from losses which they might incur by aiding those engaged in privately owned works of internal improvement. Or, to state the matter another way, its purpose is to see that public money is used only for public purposes. Consequently, it is well settled that such a constitutional prohibition does not apply to an agency of the State, such as the Authority, which is engaged in a governmental or public purpose. 81 C.J.S. States § 137-b, pp. 1169, 1170, and cases there cited. As was said in Almond v. Day, supra, "When the underlying and activating purpose of the transaction and the financial obligation incurred are for the State's benefit, there is no lending of its credit" within the meaning of this prohibition. 197 Va., at page 791, 91 S.E.2d, at page 667.
(5) In the brief filed on behalf of the respondents it is suggested that it is not a valid public purpose for the Authority to issue and sell its bonds, secured by a pledge of its assets, in order to raise money to be loaned to the localities on better terms than would be obtainable in the open market from private financial institutions.
We do not agree with this position. As has been pointed out, the plain purpose of Chapters 194 and 195 is to provide additional funds for the construction of public schools, which is manifestly a proper public purpose. The fact that such a plan may *128 incidentally be to the detriment or benefit of some private parties does not destroy its public character. Harrison v. Day, 202 Va. 967, 974, 121 S.E.2d 615, 620.
(6) The final question we are asked to decide is whether the direction in Chapter 195, that a portion of the principal of the Literary Fund be set aside "on July first, nineteen hundred and sixty-two, and on January first and July first in each year thereafter," is an "appropriation" "which is payable more than two years and six months after the end of the session of the General Assembly at which the law is enacted authorizing the same" and forbidden by Section 186 of the Constitution. The pertinent portion of that section reads thus:
"§ 186. Collection and disposition of State revenue; payment of money from State Treasurer; what appropriation shall not be made.
"All taxes, licenses and other revenues of the State shall be collected by its proper officers and paid into the State treasury. No money shall be paid out of the State treasury except in pursuance of appropriations made by law; and no such appropriation shall be made which is payable more than two years and six months after the end of the session of the General Assembly at which the law is enacted authorizing the same; * * *."
It will be observed that this section deals with the collection and disposition of State revenues. Such moneys are required to be "paid into the State treasury" and paid out of it "in pursuance of appropriations made by law." The prohibition against an extended "appropriation" therein referred to relates to a payment out of the State treasury. The Literary Fund is not a part of the State treasury. It is a distinct and separate constitutional fund. Consequently, the transfer of a portion of such fund to the Authority, as is provided in Chapter 195, is not an "appropriation" within the prohibition of Section 186.
On the whole we find nothing in Chapters 194 and 195 of the Acts of Assembly of 1962 antagonistic to any provision of the Constitution of Virginia.
Accordingly, the writ of mandamus prayed for is awarded.
Writ awarded.
NOTES
[1] The italicized portion of the section was added by an amendment ratified in 1944 and hereinafter considered.
[2] Such bonds are now issued pursuant to the Public Finance Act of 1958. Acts 1958, ch. 640, p. 948; Code, 1960 Cum. Supp., § 15-666.13 ff.