## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

VIRGINIA PUBLIC SCHOOL AUTHORITY v. WALTER W. CRAIGIE, JR.,
STATE TREASURER.

November 29, 1971.

Record No. 7764.

Present, All the Justices.

*Lee F. Davis, Jr., Assistant Attorney General (Andrew P. Miller,
Attorney General, on brief), for petitioner.*

*Harry Frazier, III (John B. Ashton; Hunton, Williams, Gay,
Powell & Gibson, on brief), for respondent.*

CARRICO, J., delivered the opinion of the court.

Invoking our original jurisdiction (Code § 17-96), the Virginia
Public School Authority (the Authority) has filed a petition for a
writ of mandamus against Walter W. Craigie, Jr., State Treasurer.
The petition seeks to require the transfer to the Authority of cer-
tain Literary Fund notes in the care of the Treasurer. It is alleged
that the Treasurer was under a statutory obligation to make such

transfer on July 1, 1971. The Treasurer has filed an answer denying any duty to transfer the notes.

As posed by the parties, these are the only questions to be decided:

1. Are Literary Fund notes previously transferred to the Authority includable as assets of the Fund in determining whether the Fund totals as much as $80,000,000 under Article VIII, § 8 of the Virginia Constitution?

2. If the Literary Fund notes previously transferred to the Authority are so includable, what assets are now required to be transferred to the Authority?

Resolution of these questions involves an analysis of the constitutional and statutory provisions affecting the Literary Fund and the Authority.

Section 134 of the old Constitution and the statutes implementary thereof (Code §§ 22-101 to -115) established the Literary Fund as a "permanent and perpetual" school fund to be invested and managed by the State Board of Education. Section 134 provided that so long as the principal of the Fund totaled as much as $10,000,000, the General Assembly was authorized to set aside for school purposes additional money received therein.

In managing the Fund, the State Board of Education makes loans to local school boards for school construction from "money belonging to the Literary Fund, and in hand for investment." Code § 22-105. For money advanced during construction, the local board delivers temporary notes to the Fund for the amounts received. Upon completion, a permanent note is delivered for the total amount borrowed. The notes are payable to the Commonwealth for the benefit of the Fund and are deposited with the Treasurer. A low rate of interest, two to three percent, is charged upon loans made to localities. Code § 22-112.

The Authority was created by the "Virginia Public School Authority Act of 1962" (Code §§ 22-29.1 to -29.15) to provide an additional source of funds to finance school construction "at less cost" to the localities than would be incurred from financing through sale of their bonds "in the open market." Code § 22-29.2. The Act authorized semi-annual transfers to the Authority of so much of the principal of the Literary Fund as was in excess of the total of $10,-000,000 and any sums lawfully set aside for school purposes. Code

§ 22-29.15. Transfers to the Authority from the Literary Fund have consisted primarily of the permanent notes evidencing local school board indebtedness for loans secured from the Fund.[1]

The Authority was authorized to purchase bonds issued by the counties, cities, and towns of the Commonwealth for school construction purposes. Code § 22-29.6. To provide the funds for such purchases, the Authority was empowered to issue its own revenue bonds, payable from (1) principal and interest payments received on local school bonds purchased by the Authority, (2) proceeds of sale of such local bonds, (3) principal and interest payments received on notes transferred to the Authority from the Literary Fund, (4) proceeds of sale of such notes, and (5) funds transferred from the Literary Fund. Code § 22-29.7. The Authority was also vested with power to secure its bonds by a trust indenture and, in such indenture or by resolution, to pledge or assign all or any part of its funds available for that purpose. Code § 22-29.8.

The Authority was required annually to "set aside and pay into the Literary Fund" the amounts of principal and interest collected on notes transferred from the Fund after deducting the portion of such amounts which had been pledged to payment of the Authority's own obligations. Code § 22-29.10. It was provided that the amount of principal so paid should become a part of the principal of the Literary Fund. This money then would become available for loans from the Fund to localities.

In operation, the Authority purchases local school bonds at interest rates designed to yield sufficient funds to pay the interest on, and the marketing costs of, its own revenue bonds. In February, 1971, the Authority sold its bonds at an average net interest cost of 4.537 percent and purchased bonds from a local school board at a net interest return of 4.6026 percent.

The Treasurer regularly made the semi-annual transfer of assets from the Literary Fund to the Authority until the revised Constitution and certain statutory enactments took effect on July 1, 1971. He refused to make the transfer called for on that date because of his doubts concerning the legality of the transfer in light of these constitutional and statutory changes.

We look first to the constitutional changes.

---

[1] The constitutionality of the "Virginia Public School Authority Act of 1962" and of the transfer of Literary Fund assets to the Authority was upheld in *Button v. Day*, 203 Va. 687, 127 S.E.2d 122 (1962).

The Commission on Constitutional Revision recommended only minor changes in former Section 134, relating to the Literary Fund. Proposed Article VIII, § 8 would have retained the $10,000,000 figure required to be on hand in the Fund before additional money received therein could be set aside for school purposes.

However, the General Assembly increased the minimum requirement to $80,000,000. At the same time, the legislature added other provisions to Article VIII, § 8, including a significant third paragraph. The section as finally adopted is worded as follows:

"§ 8. *The Literary Fund.*—The General Assembly shall set apart as a permanent and perpetual school fund the present Literary Fund; the proceeds of all public lands donated by Congress for free public school purposes, of all escheated property, of all waste and unappropriated lands, of all property accruing to the Commonwealth by forfeiture, of all fines collected for offenses committed against the Commonwealth, and of the annual interest on the Literary Fund; and such other sums as the General Assembly may appropriate. But so long as the principal of the Fund totals as much as eighty million dollars, the General Assembly may set aside all or any part of additional moneys received into its principal for public school purposes, including the teachers retirement fund.

"The Literary Fund shall be held and administered by the Board of Education in such manner as may be provided by law. The General Assembly may authorize the Board to borrow other funds against assets of the Literary Fund as collateral, such borrowing not to involve the full faith and credit of the Commonwealth.

"The principal of the Fund shall include assets of the Fund in other funds or authorities which are repayable to the Fund."

It is around the word "repayable," appearing in the third paragraph, that the present controversy revolves. It is the position of the parties that only if the Literary Fund totals as much as $80,000,000 may the transfer here sought be required. It is conceded that if the Literary Fund notes previously transferred to the Authority are includable as assets of the Fund, the Fund then would total as much as $80,000,000. The Authority contends that the notes held by it are repayable and thus includable as assets of the Fund. The Treasurer, on the other hand, contends that such notes are not repayable and therefore not includable as assets of the Fund.

The Treasurer argues that the purpose of increasing the required minimum of the Literary Fund was to curtail future transfer of Fund assets to the Authority. The intention, he says, was to provide for retention of more money in the Fund for low-cost school construction loans to the localities by the State Board of Education and eventually to phase out the Authority. It would thwart this expressed intent, according to the Treasurer's argument, to hold that the Literary Fund notes previously transferred to the Authority must be included as assets of the Fund in determining whether the Fund totals as much as $80,000,000.

It is true that in the legislative debates on Article VIII, § 8, the view was expressed that the increase in the required minimum of the Fund was designed "to phase out the Authority." But that view was expressed before the third paragraph was added to § 8, requiring inclusion in the Fund of assets held by other funds or authorities which are repayable to the Fund. There was apparently no debate on the meaning or the intended effect of the third paragraph, so it must be construed according to its own plain language. Then, whether the Literary Fund notes held by the Authority are "repayable" within the meaning of that plain language must be determined from legislation specifically fixing the nature of the obligation imposed upon the Authority with respect to such notes.

At its 1971 session, held as required to implement the revised Constitution (Schedule, § 5, Constitution of Virginia), the General Assembly amended Code § 22-29.10, a part of the Virginia Public School Authority Act of 1962. The amended section was entitled "Repayments to Literary Fund" and was worded in pertinent part as follows:

"All assets *heretofore* or hereafter transferred to the Authority from the Literary Fund pursuant to § 22-29.15 of the Code of Virginia *shall remain assets of the Literary Fund and shall be repaid to the Literary Fund* pursuant to this section, but, until so *repaid*, may be used for all purposes by the Authority to the same extent as if such assets were the sole property of the Authority.

"On or before the tenth day of January in each year the Authority shall set aside and *repay to the Literary Fund* an amount equal to the excess of the principal and interest collected by the Authority in the preceding year on account of obligations transferred to the Authority from the Literary Fund over such portion of such principal and interest as shall have been pledged by any

trust indenture or resolution authorizing bonds of the Authority."
(Emphasis added.)

Thus, in this statutory language, the legislature has made the
Literary Fund notes held by the Authority repayable within the
meaning of the third paragraph of Article VIII, § 8. While we do
not mean to indicate that the notes were not repayable to the Fund
before the amendment of Code § 22-29.10, there is no question now
that they are repayable.

The assets transferred to the Authority remain the assets of the
Fund, albeit the Authority may use them as its own for its purposes
until repaid. Code § 22-29.10 imposes an obligation upon the Au-
thority that the assets "shall be repaid" and provision is made for
the time and the way in which the Authority is to "repay" the assets
to the Literary Fund.

We do not overlook the Treasurer's argument that "[a]ssets are
not 'repayable' so long as they are pledged to the payment of princi-
pal and interest on the Authority's bonds" and that "[i]t is only *after*
the assets are free from the pledge that they are repayable." But this
argument goes only to the Authority's *ability* to repay. The legis-
lature has given the Authority power to pledge the assets but has
proclaimed that still they shall be repaid. Thus the statutorily im-
posed obligation to repay remains, unaltered by the fact that the
Authority may have pledged the assets or may not be able to repay
as required.

Accordingly, we conclude that the notes previously transferred
to the Authority are includable as assets of the Literary Fund and
that the Fund therefore "totals as much as eighty million dollars."

█ This brings us to the question of what assets should be trans-
ferred to the Authority from the Literary Fund by the Treasurer.
The confusion on the question arises because the legislature, at its
1971 session, enacted two conflicting statutes, both designed to
amend Code § 22-29.15, relative to the assets to be transferred to the
Authority.

On March 1, 1971, Chapter 127, the first Literary Fund bill, was
approved with an effective date of July 1, 1971. This act provided
for the transfer to the Authority of "so much of the principal of the
Literary Fund . . . as is in excess of the total of (a) eighty million
dollars and (b) any other moneys theretofore set aside by the Gen-
eral Assembly as authorized by law."

On May 28, 1971, Chapter 241, the second Literary Fund bill, was approved with an emergency clause making it effective July 1, 1971. This act provided for the transfer to the Authority from the Literary Fund of "all notes bearing fixed maturity dates and representing amounts loaned by the Literary Fund to local school boards pursuant to § 22-105 of the Code of Virginia."

Meanwhile, the General Assembly had continued in session beyond its normal adjournment date, thus invalidating the July 1, 1971, effective date of many bills adopted without emergency clauses. Accordingly, on May 28, 1971, Chapter 245, the omnibus bill, was approved. This bill amended and reenacted numerous chapters, including Chapter 127, the first Literary Fund bill, for the sole purpose of giving the listed chapters valid effective dates.

The omnibus bill, which reenacted the first Literary Fund bill, and the second Literary Fund bill were introduced in the House of Delegates and passed by the House and Senate on the same date, the omnibus bill passing the Senate first. Both bills were signed by the presiding officers of the House and Senate on the same date, the omnibus bill first. Both bills were signed by the Governor on the same date, the order of signing being unknown.

The Code Commission adopted the language of the second Literary Fund bill in placing amended Code § 22-29.15 in the 1971 Supplement to Volume 5 of the Code. A Code Commission note states that the changes made by the first Literary Fund bill "were superseded" by the second bill.

Thus, the question is which of the two Literary Fund bills is in effect. Given only the foregoing history of the two bills, we would have no difficulty in holding that the second Literary Fund bill is the one in effect. But there is other convincing proof that such was the intended result.

The preamble to the second Literary Fund bill states that it is "An Act to amend and reenact" § 22-29.15 "*as amended.*" In the body of the bill it is stated that § 22-29.15, "*as amended,* of the Code of Virginia, be amended and reenacted." (Emphasis added in both quotations.) At the time the second Literary Fund bill was enacted, the only amendment to Code § 22-29.15 resulted from the enactment of the first Literary Fund bill as reenacted by the omnibus bill. Therefore, the words "as amended" in the second Literary Fund bill could refer only to the effect upon Code § 22-29.15 of the first Literary Fund bill. So the clear intention of the legislature was that the pro-

visions of the second Literary Fund bill should supersede those of the first.

The writ of mandamus will issue directing the Treasurer to transfer to the Authority those Literary Fund notes in his hands on July 1, 1971, "bearing fixed maturity dates and representing amounts loaned by the Literary Fund to local school boards pursuant to § 22-105 of the Code of Virginia."

*Writ awarded.*