## Richmond

J. Lindsay Almond, Jr., Attorney General of Virginia v. Sidney C. Day, Jr., Comptroller of Virginia.

March 5, 1956.

Record No. 4501.

Present, All the Justices.

The opinion states the case.

*J. Lindsay Almond, Jr., Attorney General; Kenneth C. Patty, Assistant Attorney General* and *R. D. McIlwaine, III, Assistant Attorney General,* for the petitioner.

*David J. Mays* and *Tucker, Mays, Cabell & Moore,* for the respondent.

*J. Elliott Drinard* and *John P. McGuire, Jr.* amici curiae, for the city of Richmond.

MILLER, J., delivered the opinion of the court.

The object of this mandamus proceeding brought by the Attorney General against the State Comptroller is to determine whether or not the Board of Trustees of the Virginia Supplemental Retirement System may invest funds under its control in certain securities which it desires to purchase. The constitutionality of § 51-111.24(a), Code of 1950, under which the Board acted when it determined to purchase the securities, is questioned, and we must decide if that section violates § 185 of the Constitution of Virginia and if the contemplated investment may be made.

Section 185 of the Constitution of Virginia and Code § 51-111.24(a) follows:

"Sec. 185. Lending of credit to, or subscription to stock of corporations or persons by state, county, city or town prohibited; State shall become interested in no work of internal improvements except public roads and public parks; exceptions as to counties, cities and towns.—Neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporations, nor shall the State, or any county, city, or town subscribe to or become interested in the stock or obligations of any company, association, or corporation, for the purpose of aiding in the construction or maintenance of its work; nor shall the State become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work; nor assume any indebtedness of any county, city or town, nor lend its credit to the same; but this section shall

not prevent a county, city, or town from perfecting a subscription to the capital stock of a railroad company authorized by existing charter conditioned upon the affirmative vote of the voters and freeholders of such county, city, or town in favor of such subscription; provided, that such vote was had prior to July first, nineteen hundred and three."

"Section 51-111.24(a). The Board shall be the trustee of the several funds created by this chapter and of those resulting from the abolition of the Virginia Retirement System, and shall have full power to invest and reinvest such funds, subject to the limitation that no investment shall be made except, upon the exercise of bona fide discretion, in securities which, at the time of making the investment, are, by statute, permitted for the investment of reserves of domestic life insurance companies. Subject to such limitation, the Board shall have full power to hold, purchase, sell, assign, transfer or dispose of, any of the securities or investments in which any of the funds created herein have been invested, as well as of the proceeds of such investments and any moneys belonging to such funds."

The Virginia Supplemental Retirement System, hereinafter called the System, was created in 1952 by Title 51, Chapter 3.2, *et seq.*, Code 1950, as amended.[1] This legislation declared the System to be a body corporate, broadened the scope of the Virginia Retirement System which had theretofore existed but was abolished by Acts 1952, Chapter 1, page 3, provided for transfer of the members and funds in the abolished System to the new System, fixed the basis of employer and employee contributions and employee retirement benefits and created a board of trustees with power to invest funds held in the System as authorized by law.

Funds in the System now amount to more than seventy-five million dollars. By resolution of September 12, 1955, the Board of Trustees authorized investment of these funds in an amount to be thereafter determined by it "in bonds of public utilities and private corporations with a recognized bond guide rating of at least A and which meet requirement for investment of reserves of domestic life insurance companies."

The bond guide rating referred to is that established by Standard

---

[1] Acts 1952, Chapter 157, p. 156. 1954 Cum. Supp., Code of 1950, Title 51, Chapter 3.2, p. 140.

and Poor Corporation, Moody's Investors Service, and Fitch Investment Service, recognized authorities on investments.

The State Comptroller was doubtful of the validity of § 51-111.24(a) and advised the Attorney General to that effect. He expressed unwillingness to issue warrants investing the funds in the System in bonds of public utilities and private corporations until the validity of that section was determined. The Attorney General instituted the mandamus proceeding under authority of § 8-714, Code of 1950, to determine if the contemplated investment can be made and thus the constitutionality of § 51-111.24(a) is drawn into question.

■ Petitioner asserts that funds in the System that are proposed to be invested by the Board are not State funds, and for that reason the prohibitive provisions of § 185 do not apply.

With this contention we do not agree. The Virginia Supplemental Retirement System is an agency of the State to which the State contributes, as well as the employees; the trust fund thus created is exempted from taxation, and the System is subject to abolition at the will of the General Assembly. In addition and conclusive of the fact that the State holds and enjoys a proprietary interest in the fund is the provision found in § 51-111.16(d), which is that if the State abolishes the System, "Any funds remaining in the assets of this retirement system after all of the vested benefits provided by this section have been paid shall revert to the general funds."

Section 51-111.24(a) expressly provides that funds in the System may be invested in securities in which reserves of domestic life insurance companies are permitted to be invested.

Section 38.1-183[2] of Title 38.1, Chapter 5, states that the funds and assets of insurance companies other than their minimum capital and surplus and excess capital and surplus, may be invested in securities or property made eligible for such investments under other provisions of Title 38.1, Chapter 5. An examination of §§ 38.1-192 through 38.1-214, Code of 1950, discloses that the funds and assets mentioned in § 38.1-183, (other than minimum and excess capital

---

[2] "Any such insurer may invest its funds and assets, other than those comprising its minimum capital stock and surplus and those comprising its excess capital and surplus, only in securities or property made eligible for investment under the further provisions of this chapter. No investment in any such eligible securities or property shall exceed the limitation, if any, placed thereon in this title."

and surplus) which constitute the reserves of domestic life insurance companies may be invested in United States, State, county, city and district obligations, and in various other kinds of securities. Among these other securities in which such funds may be invested are railroad bonds or securities, bonds, notes and preferred stock of solvent corporations meeting certain requirements and other designated securities and evidences of debt and real estate, in amounts indicated and permitted by these respective sections of the Code of 1950.

However, the different kinds of securities in which reserves of domestic insurance companies may be invested need not be particularized for it is conceded that the securities mentioned in the Board's resolution meet the requirements imposed by Title 38.1, Chapter 5, Code of 1950, "for the investment of reserves of domestic life insurance companies."

Thus the question presented for decision may be briefly stated as follows:

■ Is the investment by the Board of funds in the System in bonds of public utilities and private corporations violative of § 185 of the Constitution?

The restrictive provisions of § 185 were first incorporated into the Virginia Constitution in 1869. They appeared as §§ 12, 14, and 15, Article X, under the title "Taxation and Finance," and read as follows:

"§ 12. The credit of the state shall not be granted to or in aid of any person, association, or corporation.

\*      \*      \*      \*      \*      \*      \*

"§ 14. The state shall not subscribe to or become interested in the stock of any company, association, or corporation.

"§ 15. The state shall not be a party to, or become interested in, any work of internal improvement, nor engage in carrying on any such work, otherwise than in the expenditure of grants to the state of land or other property."

In 1902 upon revision of the Constitution of 1869 (called the Underwood Constitution), §§ 12, 14, and 15 were consolidated, enlarged and incorporated into § 185, the pertinent parts of which declare:

"The credit of the state, *or of any county, city or town,* shall not be, *directly or indirectly, under any device or pretense whatsoever,* granted to or in aid of any person, association or corporation, nor shall the State *nor any county, city or town* subscribe to or be-

come interested in the stock or obligations of any company, association, or corporation, *for the purpose of aiding in the construction or maintenance of its work*, nor shall the state become a party to or become interested in any work of internal improvement * * *." (Emphasis added.)

In the revision of §§ 12, 14, and 15, accomplished by adoption of § 185, counties, cities and towns were brought under its terms and the other italicized language was also added.

The three restrictive provisions in § 185 are commonly referred to as the "credit clause", the "stock or obligation clause," and the "internal improvement clause."

The history of the development of works of internal improvement in Virginia showing the financial obligations of the State resulting from its having extended credit and aid to corporations engaged in development and operation of works of internal improvement is revealing and helpful in determining the purpose and meaning of all the provisions of § 185.

"It is settled by very high authority that in placing a construction on a Constitution or any clause or part thereof, a court should look to the history of the times and examine the state of things existing when the Constitution was framed and adopted, in order to ascertain the prior law, the mischief and the remedy. * * *" 11 Am. Jur., Constitutional Law, § 63, p. 676. 16 C. J. S., Constitutional Law, § 30, p. 68.

Prior to adoption of §§ 12, 14, and 15 in the Constitution of 1869, the State of Virginia had freely extended its credit and aid to corporations engaged in works of internal improvement. In 1816, the General Assembly created "The Fund for Internal Improvement," and incorporated a "Board of Public Works" to administer the fund. Acts 1816, ch. 17, p. 35.[3] Subsequent acts of the General Assembly show that through this Board large sums of money were loaned or advanced by Virginia to various corporations engaged in developing and operating privately owned works of internal improvements, such as canal, turnpike and railroad companies, that held promise of public benefit. Financial obligations in vast sums were incurred by the State, and its credit was freely but often unwisely extended to foster these enterprises by purchase of their

---

[3] By Acts 1830-31, Ch. CXII, p. 163, this Board of Public Works was abolished and its duties and the fund transferred to a new Board.

By Acts 1852-53, Ch. 56, p. 59, the Board was again abolished and recreated with broader powers.

bonds and stock, or through guarantee of their obligations and indebtedness. This was done with the hope and expectation that the enterprises would thrive and bring to the areas served business prosperity and to the State at large public benefit.

The magnitude of the obligations incurred by the State, and the amount of money lost by lending its credit and financial aid to such enterprises may be ascertained from an historic report of J. D. Imboden, entitled "Early History of Transportation in Virginia" in Vol. 17, page 5, House Executive Documents, 2nd Session, 49th Congress, 1886-87. At page 75 of this report it is stated that the State's railroad losses, which included its losses incident to the James River and Kanawha Canal, amounted to over $26,000,000. See also Pearson: *The Readjuster Movement in Virginia*, Chapter I; McDanel: *The Virginia Constitutional Convention of 1901-1902*, at page 59; and Virginia Magazine of History and Biography, Vol. 59 (1951), page 423, *et seq.*

This condition was not peculiar to Virginia. Decisions from other states,[4] construing similar restrictive provisions in their constitutions, show that those states had extended aid to enterprises of like nature and that financial obligations and losses thus incurred to foster and promote works of internal improvement brought about the adoption of their restrictive constitutional provisions. Descriptive of the practices engaged in by the states and informative of the unfortunate results experienced by many is the following statement in 152 A. L. R. p. 495:

"Early in the nineteenth century it seems to have been the general practice of states to encourage the building of railroads by permitting the state or a subdivision thereof to purchase stock in railroad corporations, to issue bonds or lend credit in aid of railroads, or to make outright donations to them. However, due to the large number of insolvencies of railroads, caused by frauds or economic conditions, states and subdivisions thereof found themselves largely indebted, and were themselves occasionally insolvent because of large investments in such enterprises. Therefore a reversal of policy set in. As early as 1851 Ohio adopted a constitution containing a provision prohibiting stock subscriptions or other forms of aid to corporations. In the ensuing twenty-five years most of the other states adopted similar provisions, either prohibiting aid altogether or

---

[4] *Hagler* v. *Small*, 307 Ill. 460, 138 N. E. 849; *Grout* v. *Kendall*, 195 Iowa 467, 192 N. W. 529; *Johns Hopkins University* v. *Williams*, 199 Md. 382, 86 A. (2d) 892.

requiring a vote of the people before a subscription to stock or other sort of aid could be made or extended. At present, at least thirty-eight states have such constitutional provisions, and several have statutory provisions on the subject."

Mindful of the principle that the act of the legislature is presumed to be valid, *Ex parte Settle,* 114 Va. 715, 77 S. E. 496; *Roanoke* v. *Michael's Bakery Corporation,* 180 Va. 132, 21 S. E. (2d) 788; *Dean* v. *Paolicelli,* 194 Va. 219, 72 S. E. (2d) 506, and that we are not entitled to declare it unconstitutional unless its invalidity be clearly shown, we now test § 51-111.24(a) by applying to it the restrictive provisions of § 185.

Though all of § 185 must be considered and given effect, yet for a better understanding of its purpose and intent, we analyze and weigh its several restrictive provisions, and first address our attention to the "credit clause."

In *Holston Corporation* v. *Wise County,* 131 Va. 142, 109 S. E. 180, and in *U. S. Fidelity Co.* v. *Carter,* 161 Va. 381, 170 S. E. 764, we had occasion to interpret § 185. Recital of the facts in the *Holston* case shows that Wise county undertook a program of road construction, and entered into a contract with Holston Corporation for the purchase of needed crushed stone. The contract was made by the county directly with the corporation before advertising for bids from contractors to do the road work. In the contract the corporation agreed with the county to furnish stone at specified prices to any contractor to whom road work was let and the county guaranteed payment for the crushed stone to be used in construction of its roads, and thus for its benefit. In holding that the contract was not within the inhibition of § 185, the court said:

"The contract in question did not directly or indirectly in any way whatsoever grant 'the credit' of the county 'to or in aid of any person, association or corporation.' That would have been true if the object of the contract had been to benefit the contractors in any way, as, for example, to enable any of them to obtain the stone on the credit of the county, when upon their own credit they could not have obtained it; or to enable any of the contractors to make a greater profit by obtaining the stone at a reduced price because of the pledge of the credit of the county. But the contractors were not expected and could not in the nature of the case derive any benefit from the contract, and it was not made for their benefit.

It was made solely for the benefit to the county itself, and not for or in aid of any other. * * *"  At page 157, 158.

In *U. S. Fidelity Co. v. Carter, supra,* the evidence disclosed that the treasurer of Pittsylvania county had deposited funds resulting from collection of state and county levies in a local bank and one of the questions presented for decision was whether or not the deposit of these public funds in the bank was a grant of the county's credit to the bank and thus a violation of § 185.   In disposing of that question, we said:

"There may perhaps be cases in which the deposit of public funds in a bank by the Commonwealth or a county would be a violation of section 185 of the Constitution of Virginia * * * where the deposit was made as a device to lend the credit of the Commonwealth or the county to the bank for the purpose of aiding the bank.  But it is not properly to be construed to prohibit the Commonwealth or a county from making a general deposit of public funds in a bank in the usual course of business for its own convenience."   At page 406.

In these cases the court pointed out that the challenged transactions would have been prohibited by § 185 if they had been for the purpose of benefiting the parties with whom the respective counties were contracting.  In the *Holston* case, the court observed that the contract would have violated the provisions of § 185 "if the object of the contract had been to benefit the contractors in any way."  In the *U. S. Fidelity Co.* case the court said that a deposit of public funds in a bank might violate § 185 if it "was made as a device to lend the credit of the Commonwealth or the county to the bank for the purpose of aiding the bank."

The rationale of these two decisions clearly appears to be that the moving consideration and motivating cause of a transaction are the chief factors by which to determine if it is prohibited by § 185. Whether or not a transaction contravenes the "credit clause" in § 185 depends upon its animating purpose and the object that it is designed to accomplish.

In *Bannock County* v. *Citizens Bank and Trust Co.,* 53 Idaho 159, 175, 22 P. (2d) 674, the court interpreted the phrase "lend or pledge the credit" used in the Idaho Constitution, as follows:

"In the popular sense, lending or loaning money or credit is at once understood to mean a transaction creating the customary relation of borrower and lender, in which the money is borrowed for

a fixed time, and the borrower promises to repay the amount borrowed at a stated time in the future, with interest at a fixed rate. And that is the sense, then, in which the language employed in those sections must be understood, and so understood, no county, for example, shall lend or pledge its credit or faith directly or indirectly, or in any manner which would create the customary relation of borrower and lender."

Of like effect is *Limestone County* v. *Montgomery*, 226 Ala. 266, 146 So. 607.

Use of the State's funds for purchase of securities for the State's benefit is not an extension of "credit" which poses any threat to the financial security or welfare of the State. Extending its credit to aid and promote private enterprise was the evil from which the State had suffered financially. The potential danger incurred in lending credit to foster and promote the interests of those who had no rightful claim, in justice or in morals, to the State's help or relief was the evil to be arrested. When the underlying and activating purpose of the transaction and the financial obligation incurred are for the State's benefit, there is no lending of its credit though it may have expended its funds or incurred an obligation that benefits another. Merely because the State incurs an indebtedness or expends its funds for its benefit and others may incidentally profit thereby does not bring the transaction within the letter or the spirit of the "credit clause" prohibition.

We now consider the "stock or obligation clause" which forbids the State to "subscribe to or become interested in the stock or obligations of any company, association, or corporation, *for the purpose of aiding in the construction or maintenance of its works.*" (Emphasis added.)

When this clause was first inserted in the Constitution of 1869, the underlined terminal phrase was not included. The framers of the Constitution of 1902 added this qualifying phrase. Before its addition and incorporation into § 185, the clear and certain prohibition forbade the State to subscribe to or become interested in the stock or obligation of any company, and the purchase by the State of bonds or stock of a private company was undoubtedly forbidden. If the clause were still in effect without the qualifying phrase added in 1902, § 51-111.24(a) would be invalidated insofar as it, by reference to Title 38.1, authorizes the purchase of stock or obligations of private corporations with State funds. However, the

addition of the terminal phrase was for a definite purpose, and it has a certain meaning. Clearly its effect is to modify the preceding unqualified prohibition. Now the prohibition is not absolute but definitely qualified. It operates on the State only to prevent it from subscribing to or becoming interested in the stock or obligations of a private company when the transaction in question is *for the purpose of aiding in the construction or maintenance of the works of such company*.

The historical background of this provision and the qualifying phrase added in 1902 make it abundantly clear that the purpose of the transaction is the vital and controlling factor by which its validity or invalidity shall be determined. When the purchase of corporate securities, *i.e.*, bonds, stock or other obligations of a company is made with State funds which are being invested in the ordinary course of business for the State's benefit, and the transaction is not activated or made with the purpose of aiding in the construction or maintenance of the works of a company, such purchase is not forbidden by § 185. We find nothing to indicate that the resolution of the Board that authorized purchase of the bonds was adopted for the purpose of aiding any company in constructing or maintaining its work of public improvement.

■ Does the prohibition that forbids the State to "become a party to or become interested in any work of internal improvement" render § 51-111.24(a) invalid and forbid the purchase of the bonds authorized by the Board?

In *Shenandoah Lime Co.* v. *Governor*, 115 Va. 865, 80 S. E. 753, it was held that the Convict Lime Grinding Act of 1912,[5] under which state funds were appropriated and provision made for the establishment of facilities in which convict labor was to be employed for grinding limestone rock and oyster shells to be used in road construction did not violate the "work of internal improvement clause" of § 185 because lime grinding facilities were not works of internal improvement. In reaching this conclusion the court adverted to the history of § 185 and pointed out that the phrase "work of internal improvement" had a "long accepted meaning" and had reference to channels of trade and commerce including such operations as "turnpikes, canals, railroads, telegraph lines," and in "more recent years telephone lines, and other works of a like *quasi* public character." Its further observation in this respect follows:

---

[5] Acts 1912, ch. 295, p. 586.

"In the past these works, designated as 'works of internal improvement,' were sometimes constructed and operated by the State, but generally by corporations composed of private individuals, which, because of the public character of their works, always enjoyed the power of eminent domain, owed duties to the public and were subject to State regulation. These corporations, because of the great need of such improvements at the time and the difficulty attending the construction of such works, were generally encouraged by State aid, and it was not until the Constitution of 1869 that the State was inhibited from becoming a party to or interested in such works of internal improvement." At page 872.

The provision forbidding the State to "become a party to or become interested in any work of internal improvement," as well as the "credit" and the "stock or obligations" clauses was inserted in the basic law to remedy the same evil, and the three clauses were adopted to meet the same long existing threat and danger, namely, the use of the State's funds and credit to foster and encourage construction and operation of private enterprises.

The prohibition is directed against becoming a party to or becoming interested in the company's *work of internal improvement.* Its background negates the idea that the prohibition encompasses the mere purchase by the State of securities in the open market in the ordinary course of investing State funds for its benefit even though the issuer of the securities purchased is engaged in work of internal improvement.

█ This conclusion is fortified by the interpretation of § 185 made by the legislature that assembled immediately after its adoption, and that contemporaneous legislative construction must be accorded its due weight. In 1903, the legislature authorized the investment of capital and unappropriated income of the literary fund in railway company bonds. This authorization, made immediately after adoption of § 185, is found in Acts 1902-03-04, Ch. 509, p. 801, (amending Chapter 66, Code of 1887) in the following language:

"Sec. 1433. Duties of State Board of Education.—The powers and duties of the board shall be as follows:

  \*  \*  \*  \*  \*  \*  \*

"Eleventh. To invest the capital and unappropriated income of the literary fund in bonds of this State, or of the United States, or in bonds of railroad companies secured by first mortgage whose market value for six months preceding the investment has not been less than ninety cents on the dollar."

Though the Virginia Constitution of 1869 forbade the State to subsidize or engage in works of internal improvement, yet the General Assembly of 1869-70 also authorized the investing of capital and unappropriated income of the literary fund in bonds of companies engaged in works of internal improvement. Acts 1869-70, Ch. 259, p. 402.

Like authorization for the investment of the capital and unappropriated income of the literary fund in bonds of railroad companies was authorized time and again after the adoption of the Constitutions of both 1869 and 1902, and exists today under the provisions of § 22-102, Code of 1950.

Similar authorization was made in 1908 when the Assembly established a retirement fund for public school teachers and empowered the State Board of Education to invest the capital and unappropriated income of that fund in bonds of railroad companies. Acts 1908, Ch. 313, p. 559. This authorization to invest that fund in railroad company bonds was often repeated in subsequent acts of the General Assembly[6] until the fund was abolished and the purposes of the Act of 1908 establishing the "retired teachers fund" was incorporated in the Virginia Retirement Act of 1942.[7]

In *Cohens* v. *Virginia*, 6 Wheat. 264, 418, 5 L. ed. 257, Chief Justice John Marshall said:

"Great weight has always been attached and very rightly attached, to contemporaneous exposition."

Like statements of that principle have been made by this court.

"Contemporaneous legislative construction of a constitutional provision is entitled to great weight." *Roanoke* v. *Michael's Bakery Corporation, supra,* at p. 143, and cases cited.

Upon extending to § 51-111.24(a) the presumption of validity to which it is entitled, we find nothing in § 185 of the Constitution that forbade its enactment, and upon the record, the Board of Trustees of the Virginia Supplemental Retirement System is entitled to make purchase of the bonds contemplated to be acquired under its resolution of September 12, 1955.

The writ of mandamus prayed for will be awarded.

*Mandamus awarded.*

---

[6] Acts 1910, Ch. 97, p. 127; Code of 1919, Ch. 36, p. 263, "Pensions for Retired School Teachers," § 793; Code of 1936, Ch. 36, p. 196, § 793; Acts 1942, Ch. 325, p. 481.

[7] Acts 1942, Ch. 325, p. 481; (Ch. 105A, § 2672(1), *et. seq.,* Code of 1942.)