459 S.E.2d 531 (1995)
194 W.Va. 143
STATE of West Virginia ex rel. Glen B. GAINER III, Auditor of the State of West Virginia, Petitioner Below, Appellant,
v.
The WEST VIRGINIA BOARD OF INVESTMENTS, Respondent Below, Appellee.
No. 22574.
Supreme Court of Appeals of West Virginia.
Submitted January 18, 1995.
Decided May 31, 1995.
*532 Robin K. Welch, Sp. Asst. Atty. Gen., Charleston, for appellant.
Frances A. Hughes, Managing Deputy Atty. Gen., Charleston, for Atty. Gen.
Daniel R. Schuda, Joanna I. Tabit, Steptoe & Johnson, Charleston, for appellee.
WORKMAN, Justice.
Glen B. Gainer, III, as Auditor of the State of West Virginia, appeals from the June 14, 1994, order of the Circuit Court of Kanawha County denying his request for injunctive and declaratory relief to prohibit the Appellee West Virginia Board of Investments ("Board") from investing certain monies from the consolidated pension fund in corporate stocks.[1] After reviewing this matter in full, we conclude that the lower court erred in determining that West Virginia Code § 12-6-9(j) (1991)[2] is not violative of Article X, Section 6 of the West Virginia Constitution. Accordingly, we reverse the decision below.
The underlying declaratory judgment action was initiated following the issuance of an attorney general's opinion addressing the following question: "[i]s it lawful for the West Virginia Board of Investments to invest the trust funds in the `consolidated pension fund,' which represents monies of the Public Employees Retirement System ["PERS"], in corporate stock of any private corporation or association?"[3] The advisory opinion issued *533 by the attorney general on July 13, 1993, stated that the Board's investment of consolidated pension funds in corporate stocks violated article X, section 6 of the state constitution as well as the fiduciary principles enunciated in Dadisman v. Moore, 181 W. Va. 779, 384 S.E.2d 816 (1989).
On May 12, 1994, the Appellant filed a petition in circuit court seeking a temporary injunction and declaratory judgment consistent with the opinion issued by the attorney general. Following a hearing on these issues on May 12, 1994, the circuit court issued an order on June 14, 1994, concluding that "West Virginia Code § 12-6-9(j) [1990] is not violative of article X, section 6 of the Constitution of West Virginia." This ruling was expressly predicated on the maxim that a legislative enactment is presumptively constitutional combined with the court's finding that article X, section 6 "was enacted to prevent the State from engaging in the operation of business or enterprise rather than to prevent the State from seeking dividend income from an investment." See Syl. Pt. 2, in part, State ex rel. State Bldg. Comm'n v. Moore, 155 W. Va. 212, 184 S.E.2d 94 (1971) (recognizing that "`negation of legislative power must be manifest beyond reasonable doubt'"). This appeal challenges the circuit court's reasoning and conclusions.

I.
In 1990, the legislature amended West Virginia Code § 12-6-9 to include subsection j, thereby permitting the Board to invest up to twenty percent of the PERS consolidated pension fund in corporate stock. The Appellant argues that West Virginia Code § 12-6-9(j) is unconstitutional on its face based on the following underscored constitutional language:
The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever.

W.Va. Const. art. X, § 6 (emphasis supplied).
Conversely, the Appellee maintains that the constitutional proscription found in section six of article ten does not stand as a bar to investing a legislated portion of the consolidated fund in corporate stocks. To support its position, the Appellee references the legislative intent behind the enactment of the subject constitutional language. In State ex rel. Dyer v. Sims, 134 W. Va. 278, 58 S.E.2d 766 (1950), rev'd on other grounds, 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951), this Court explained:
The purpose of Section 6 of Article X was to guard against the granting of the credit of the State in aid of any county, city, township, corporation or person, or the assumption of their debts or liabilities; and against the State becoming a joint owner or stockholder in any company or association.... The purposes of the section are well known, being to guard against the mistakes of the mother Commonwealth of Virginia in granting aid to counties, and particularly in granting aid to organizations for the purposes of so-called public improvements, and in becoming stockholders of such organizations.
134 W.Va. at 289, 58 S.E.2d at 773 (emphasis supplied).
The Appellee chooses to view the historical basis of prohibiting credit from being extended for the development and private operation of public improvements such as canals, turnpikes, and railroads as the sole intent underlying the enactment of article X, section six. See Almond v. Day, 197 Va. 782, 787-88, 91 S.E.2d 660, 664-665 (1956). As the Day decision readily acknowledges, Virginia and at least thirty-eight other states have constitutional provisions concerning the prohibition of stock subscriptions or credit by the state. See id. at 788-89, 91 S.E.2d at 665 (quoting 152 A.L.R. 495). Article X, Section Six of the West Virginia Constitution and similar other state constitutional provisions dealing with stock or credit proscriptions were clearly drafted in response to the historical occurrence of numerous unwise credit extensions having been made by the states during the *534 early nineteenth century. See Day, 197 Va. at 787-88, 91 S.E.2d at 664-65; see generally Stewart E. Sterk and Elizabeth S. Goldman, Controlling Legislative Shortsightedness: The Effectiveness of Constitutional Debt Limitations, 1991 Wis.L.Rev. 1301, 1306-12. The constitutional language at issue, however, is not limited or restricted in scope to prohibiting the state from analogous stock for credit arrangements.
Although the language at issue is grouped with language which bars the state from granting credit to any entity, the specific language at issue is stated unambiguously: "nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever." W. Va. Const. art. X, § 6. In resolving this issue of constitutional interpretation, we are bound by the well-established precept that "[w]here a provision of a constitution is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed." Syl. Pt. 3, State ex rel. Smith v. Gore, 150 W. Va. 71, 143 S.E.2d 791 (1965).
We do not accept the Appellee's argument that the purpose of article X, section six was limited to the avoidance of stock for credit transactions similar to those engaged in during the early nineteenth century. In examining the legislative intent underlying an analogous Arizona constitutional provision, the court in State v. Northwestern Mutual Insurance Co., 86 Ariz. 50, 340 P.2d 200 (1959), summarized, "[t]hus ..., the evil to be avoided was the depletion of the public treasury or inflation of public debt by engagement in non-public enterprises." Id. at 53, 340 P.2d at 201; accord Engelking v. Investment Bd., 93 Idaho 217, 222, 458 P.2d 213, 218 (1969); Day, 197 Va. at 791, 91 S.E.2d at 667. Without exception, this concern that public debt be curtailed permeates the adoption of every constitutional provision which imposes restrictions on the lending of credit by the state or prohibits the state from being a stockholder. See Sterk et al., supra, at 1306-15. We conclude that the constitutional language at issue cannot be read as proscribing only those type of historical credit for stock transactions which served as the impetus for the enactment of article X, section six. Instead, the clearly-stated proscription against the state becoming an owner of corporate stock must be read in accordance with its clear and plainly-stated terms. See Gore, 150 W. Va. at 72, 143 S.E.2d at 792, syl. pt. 3.

II.
As its primary argument, however, the Appellee asserts that the funds represented by the consolidated pension fund do not belong to the state but rather to the individual PERS beneficiaries. Based on this characterization, the Appellee contends that the proscriptive language found in article X, section six does not apply. As support for this position, the Appellee cites this Court's decision in Dadisman, in which we held, inter alia, that the legislature acted unconstitutionally in transferring funds from the PERS to pay insurance premiums to the public employees' insurance agency. 181 W. Va. at 793, 384 S.E.2d at 830.
The Appellee focuses specifically on the language of syllabus point twenty-one of Dadisman, which states that:
[m]oneys earned by public employees and contributed to a public employees' retirement plan, including the employers' contribution which has been earned by the public employees, become part of the corpus of the trust and are not thereafter state funds for expropriation or use for any purpose other than that for which the moneys were entrusted.

Id. at 782-83, 384 S.E.2d at 819-20. According to the Appellee, the underscored language decrees that PERS funds are not state funds. This argument is patently flawed. The language identifying PERS funds as no longer constituting state funds is expressly connected with the concept of expropriating such funds for "any purpose other than that for which the moneys were entrusted." Id. Upon considering that the factual precipitation for Dadisman was the unlawful transfer of PERS funds to pay insurance premiums, it becomes exceedingly apparent that the designation of PERS funds as not being state moneys is causally dependent on the *535 related concept of expropriation. Even a cursory reading of Dadisman results in the conclusion that the objective of syllabus point twenty-one was to set forth in no uncertain terms that PERS funds, once deposited, could be used for no other purpose than remittance to PERS beneficiaries. See id. at 793, 384 S.E.2d at 830 and syl. pt. 21. Thus, Appellee's attempt to cite syllabus point twenty-one as dispositive on the issue of whether PERS funds are owned by the state is tenuous, at best.
The Appellee cites only one case for the proposition that the PERS funds are not state moneys prior to distribution. In Louisiana State Employees' Retirement System v. State Through Department of Justice, 423 So.2d 73 (La.App.1982), aff'd, 427 So.2d 1206 (La.1983), the court determined that because the funds of a public employees' retirement system belonged to the members of the retirement systems, the funds were not subject to the constitutional provision prohibiting the state from purchasing corporate stock. See 423 So.2d at 74-75. We are not persuaded by that decision, notwithstanding its factual and legal apposition,[4] as the reasoning of that decision is Spartan, at best. Louisiana State Employees' Retirement System, in its limited analysis, fails to consider the full nature of the ownership of funds placed in a public employees' retirement system and the related concept of whose responsibility it is to replace any losses incurred by such a system.
These issues of ownership and loss responsibility as they relate to public employees' retirement funds were discussed in ICMA Retirement Corp. v. Executive Department, 92 Or.App. 188, 757 P.2d 868, review denied, 306 Or. 661, 763 P.2d 152 (1988). That case examined whether a constitutional prohibition against the state's purchase of corporate stock barred the investment of public employees' deferred compensation in a trust plan. 92 Or.App. at 190, 757 P.2d at 869. Arguments similar to those advanced by the Appellee in this case were raised, including:
the state should not be regarded as the `owner' of deferred compensation money, because it owns the money only to the extent necessary to satisfy federal tax law. It [ICMA] contends that the employe[e]s are the beneficial owners, because deferred compensation is credited to employe[e]s for the purpose of computing retirement, pension and social security benefits.
Id. at 192, 757 P.2d at 870 (footnote omitted). Rejecting those contentions as well as the argument that no risk of loss was involved, the court reasoned first that "[t]he threshold test is not risk of loss, but ownership." Id. The ICMA court concluded that "the state would have a `proprietary' or `ownership' interest in the deferred compensation money that would be invested" and that, therefore, "[t]he purchase of corporate stock with deferred compensation money, ... is barred by the `general prohibition' of Article XI, section 6, against the state's purchase of corporate stock." Id.; cf. Sprague v. Straub, 252 Or. 507, 451 P.2d 49 (1969) (holding that investment of public employee retirement funds in corporate stocks did not violate constitutional stock proscription language under theory that state is merely custodian of funds and therefore holds no proprietary interest in same).[5]
The Indiana Supreme Court considered issues analogous to those under consideration in Board of Trustees of the Public Employees' Retirement Fund v. Pearson, 459 N.E.2d *536 715 (Ind.1984), prior to determining that the constitutional prohibition against the state becoming a stockholder precluded investment of the public employees' retirement fund in corporate stock. Id. at 718. Initially, the court examined the intent of the constitutional language at issue[6] and concluded that:
There can be little doubt that the general purpose of the last clause of the section was to bar the State of Indiana from placing state money at risk in corporate stocks. The delegates saw an intolerable risk of loss attendant to the ownership of some stocks, and therefore to be sure that the State of Indiana would never again run that risk, enjoined the ownership of all stocks.

Id. at 717 (emphasis supplied). The Pearson court then examined whether the Board of Trustees ("Board") was acting in a private or a public capacity with regard to overseeing the investments as well as the ownership of the funds placed in the public employees' retirement system.
The Board of PERF is a state agency, created by statute, and when it makes the selection of an investment for the Fund it is carrying out a statutorily prescribed duty. This is the State in its sovereign capacity. The Board's origination, its capacity, and its duties are the product of legislative and not private action....
....
The statutory declaration that the members own the contributions and interest in PERF means that they own these monies subject to the terms of the trust. Members cannot determine the types of investments which the Board may make. Members do not bear the risk of loss of their money in the pension fund, in the event financial losses are sustained.... If the value of stocks purchased for PERF fell in value, then the State could suffer a loss. This appears to be one of the types of adverse results or risks within the sweep of the clear language of the Constitution and the concerns expressed by delegates to the constitutional convention.
Id. at 718 (citation omitted).
In the Day decision reached by our sister state in 1956, the Virginia Supreme Court examined the constitutionality of a statute permitting the Board of Trustees of the Virginia Supplemental Retirement System to invest funds in securities.[7] Similar to the Appellee in this case, the petitioner in Day asserted that the funds were not state funds and thereby not subject to applicable constitutional prohibitions. 197 Va. at 785, 91 S.E.2d at 663. The Virginia court quickly dispensed with this contention, explaining that "[t]he Virginia Supplemental Retirement System is an agency of the State to which the State contributes, as well as the employees; the trust fund thus created is exempted from taxation, and the System is subject to abolition at the will of the General Assembly." Id. The court further noted that the "State holds and enjoys a proprietary interest in the fund...." Id.
In considering whether the statute authorizing investment of public retirement funds violated the "stock or obligations clause," the court explained the effect of certain qualifying language that was added to the original clause.
We now consider the `stock or obligation clause' which forbids the State to `subscribe to or become interested in the stock or obligations of any company, association, or corporation, for the purpose of aiding in the construction or maintenance of its works....'
When this clause was first inserted in the Constitution of 1869, the underlined [italicized] terminal phrase was not included. The framers of the Constitution of 1902 added this qualifying phrase. Before its addition and incorporation into § 185, *537 the clear and certain prohibition forbade the State to subscribe to or become interested in the stock or obligation of any company, and the purchase by the State of bonds or stock of a private company was undoubtedly forbidden. If the clause were still in effect without the qualifying phrase added in 1902, § 51-111.24(a) would be invalidated insofar as it, ... authorizes the purchase of stock or obligations of private corporations with State funds. However, the addition of the terminal phrase was for a definite purpose, and it has a certain meaning. Clearly its effect is to modify the preceding unqualified prohibition. Now the prohibition is not absolute but definitely qualified. It operates on the State only to prevent it from subscribing to or becoming interested in the stock or obligations of a private company when the transaction in question is for the purpose of aiding in the construction or maintenance of the works of such company.
197 Va. at 791-92, 91 S.E.2d at 667. While the result reached in Day was that the statute at issue did not violate the stock clause of the Virginia constitution, such finding was expressly conditioned on the inclusion of qualifying language which banned state involvement in stocks only "for the purpose of aiding any company in constructing or maintaining its work of public improvement." Id. at 792, 91 S.E.2d at 668. Under the reasoning expressed in Day, that court, if faced with our current question of constitutional infringement, would conclude that West Virginia Code § 12-6-9(j) violates article X, section six of our constitution. See 197 Va. at 791-92, 91 S.E.2d at 667.
Borrowing the reasoning employed in Day, Pearson, and ICMA, we determine that until funds are withdrawn and paid out to individual members of the PERS, the state has a beneficial ownership interest in such funds arising from the statutory trust relationship created by the enactment of the West Virginia Public Employees Retirement Act, West Virginia Code §§ 5-10-1 to -54 (1994 & Supp.1994). See Dadisman, 181 W. Va. at 784, 384 S.E.2d at 821. Based on this same ownership/trust interest, this Court held in syllabus point twenty-three of Dadisman that "[t]he amounts expropriated from the retirement trust funds for purposes other than those for which the funds were collected constitute a public debt owed by the state to the trust funds, and such expropriation must be remedied by recompense through appropriation." Id. at 783, 384 S.E.2d at 820. We expounded further on the obligations imposed by this trust relationship in Dadisman, holding that:
The Board of Investments has a fiduciary relation with the PERS trust and participants and must invest employee earned pension system assets consistently with the highest standards of fiduciary duty. It must utilize competent, educated, and trained financial managers to seek and manage high quality investments and to avoid speculative commercial and industrial ventures and schemes.
Id. at 783, 384 S.E.2d at 820, syl. pt. 25.
The clear language of article X, section six itself stands as a bar to state ownership of corporate stocks. This result is compelled by virtue of the fact that article X, section six is written as an unconditional proscription of the State's investment in stock of any company or association. Given this Court's obligation to enforce the state constitution as written, we have no choice but to conclude that West Virginia Code § 12-6-9(j) (1991) is invalid and unenforceable as it violates the all-encompassing proscription found in Article X, Section 6 of the West Virginia Constitution against the state becoming a stockholder in any company or association.

III.
We do not dispute the Appellee's contention that the framers of this state's constitution did not contemplate the investments authorized by West Virginia Code § 12-6-9(j). In fact, we recognize that the statute authorizing these investments may reflect sound investment strategy, provided such investments are intelligently selected and monitored. Nonetheless, our obligation to enforce the language of the constitution when it is plain and unambiguous requires that we refrain from interpreting such language as it clearly proscribes, without restriction, all instances *538 of state involvement in the stock market. See Engelking, 93 Idaho at 222, 458 P.2d at 218 (recognizing that constitutional clause "prohibits the State from directly or indirectly becoming a stockholder in any association or corporation[ ]"); see also Michigan Sav. & Loan League v. Municipal Fin. Comm'n, 347 Mich. 311, 79 N.W.2d 590 (1956) (declaring unconstitutional statute authorizing school district investment in savings and loan associations in view of prohibition against state investment in corporate stock). Absent a constitutional amendment,[8] the investment of PERS funds in corporate stock within the contemplation of West Virginia Code § 12-6-9(j) is clearly unconstitutional.
We do not dispute that investments in the stock market would likely produce a greater return over the long term for the consolidated fund, if prudently invested, than is currently being realized.[9] As the Pearson court recognized, "according to today's investment wisdom, a prudent and balanced investment policy ... would include dealing to some extent in the stock market." 459 N.E.2d at 716. However, our task here is not to choose or approve of investment strategies, but to determine whether West Virginia Code § 12-6-9(j) comports with the clear language of Article X, Section 6 of the West Virginia Constitution.
Based on the foregoing reasoning, the decision of the Circuit Court of Kanawha County is hereby reversed.
Reversed.
CLECKLEY, Justice, concurring:
I concur in the entirety of the excellent majority opinion. I write separately only to add a few observations. First, as Justice Workman accurately described, the primary impetus behind the inclusion of Section 6 of Article X in the 1863 Constitution was a desire by a majority[1] of those voting to avoid the burdensome and unwise debts that had been incurred by the mother commonwealth of Virginia and by other states during the decades preceding the Civil War. Also influential, however, was a desire to avoid another (though related) undesirable development that plagued Virginia. Many in what is now West Virginia believed, and resented, that political cronyism and bias for eastern development controlled state investments rather than need or sound investment strategy. See, e.g., Remarks of Delegate Van Winkle, 3 Debates and Proceedings of the First Constitutional Convention of West Virginia at 228-29. State stock purchases typically benefitted those entities which were connected with powerful eastern legislators, and this practice *539 offended the westerners' sectional and moral sensibilities. Clearly, such favoritism would detract from good government and wise decision making.
Second, the framers who opposed state investment in private corporations and individuals did so because they believed it unsound to turn public dollars over to private entities whose overriding motive is profit, not the public interest.[2] A transfer of public money to support capitalistic enterprises thus meant that those funds would be diverted to advance private profit making and not necessarily the best interests of the people. Admittedly, what is good for corporate profits is sometimes good for the public; yet corporate and public aspirations often run at cross-purposes.
Third, I believe Section 6 prevents still another evil: when government officials invest in private corporations, they invite favorable treatment for the objects of the investments and, perhaps, unfavorable treatment for the objects' competitors. Thus, a state investment portfolio can disrupt the essential objectivity that government-as-regulator should maintain, both in its legislative and enforcement capacities.
These potential evils are at least implicated by the facts of this case. Whether such harms could be prevented by the creation of less drastic procedural safeguards and whether the need for a greater return on state investments of pension and similar funds outweigh the concerns regarding state indebtedness, political favoritism, and profiteering are not questions for us to decide. As Justice Workman correctly explains, we are not free to ignore the clear commands of the Constitution; only the people voting on a constitutional amendment can change Section 6's answers to the above questions and decide that modern pension arrangements call for a modified attitude about state investment in private corporations.[3]
NEELY, Senior Justice, dissenting:
The majority opinion is well reasoned and elicits great respect from me. Nonetheless, I dissent because I don't believe that our Constitution compels the majority's conclusion. As the majority opinion forthrightly recognizes, the purpose of W.Va. Const. Art. X, § 6 was to prevent state government from helping selected private businesses when those businesses had powerful political allies. W.Va. Const. Art. X, § 6 was written long before state-managed pension plans presented the problem of sustaining the inflation-adjusted value of massive amounts of accumulated capital.
The State now manages more than a billion dollars of employee money over scores of years for the benefit of both employees and taxpayers. The inflation-adjusted value of the principal must be preserved, but in addition the fund must be made to grow if the inflation-adjusted level of benefits are to be maintained at payout time. The dead hand of the past in the form of Art. X, § 6 hampers the pension fund managers from maximizing return in a safe manner in spite of the fact that such a result was not even remotely contemplated or intended by the framers.
This Court has already held in Booth v. Sims, 193 W.Va. 323, 456 S.E.2d 167 (1995) *540 (as modified) that pension contracts with current and former State employees are lawful debts of the State. That means that the State must come up with the money to pay state employee pensions when they come due. The pension obligations are set in stone (at least for persons currently in the system who have relied to their detriment, see Booth, supra ); the only question yet to be answered is how much money will be available to pay these pension debts from cash accumulated in the pension fund itself and how much money will need to be gathered in new taxes from our yet unborn children?
I come from old money; my family has been comfortably fixed since the 19th century. In each generation some members of my family make enough money to add to their fortunes while others don't; but everybody has been taught from the cradle how to preserve whatever inheritance they may receive. To my knowledge, no one in my family has owned a bondgovernment or otherwise since before the Great Depression (ca. 1929) except for liquidity.[1] If neither I nor three generations of my competent ancestors believed that bonds are worth a damn for long term investment, why would I require the people who voted for me to use bonds as their exclusive long term investment? I would do that only if our Constitution absolutely demanded it. Thus, because I believe that W.Va. Const. Art. X, § 6 was drafted to prevent an evil entirely unrelated to the unwise investment of pension funds, I conclude that ourConstitution does not demand the fiscally idiotic result the majority have reached today.
The real objection that the opponents of common stock investment have to liberalizing the investment rules is that the opponents believe that the people who work for the State are dolts, simpletons and political whores who are likely to lose the State's money. Although money has been lost at the State Consolidated Investment Fund, (see, State of West Virginia v. Morgan Stanley, 194 W.Va. 163, 459 S.E.2d 906 (1995)), most of the people who work in State government are pretty competent. Furthermore, the people in my class in the West Virginia Legislature (1971-73) were among the smartest and most competent people I ever met. Thus, I do not accede to the basic premise behind a strict construction of W.Va. Const. Art. X, § 6namely, that the folks we hire at the Board of Investments or the State Treasury are dolts, simpletons, or political whores. Indeed, by enlarge, I find senior government executives among the more competent people in the State. (See, Morgan Stanley, supra, for a full discussion of the facts surrounding the State's loss in 1987.)
The great jeopardy to which all saved money is exposed in the United States as we enter the 21st Century is inflation. Historically, for reasons that have to do with maintaining something approaching full employment in America (at least as economists define "full employment") the federal government will always adopt fiscal policies that guarantee an average rate of inflation of roughly five percent a year, year in and year out.[2] That means that the real rate of return on 6 percent or 7 percent government bonds is vanishingly small: retirees and taxpayers get little more back in inflation-adjusted dollars than the employees and the taxpayers contributed into the fund to begin with.[3]
*541 Of course, the best counter argument to what I have just asserted is that at least the retirees and taxpayers will get back what they put in. Well ... that's fine if inflation stays at roughly five percent a year, but if we get into a war, or some other circumstance demands great government borrowing and spending, inflation will return to the double digit levels of the late 1970's and early 80's and retirees won't get back what was contributed in inflation-adjusted dollars.[4]
As I wrote in footnote 24 of Morgan Stanley, supra:
After all, if there had been a Dow Jones Index Fund in September, 1929, the prudent investor who had heavily invested in such a fund as the quintessential exercise in "modern portfolio management" would have been a hurt'n cowboy by January, 1930. Indeed, it is wonderful fun to watch young instructors in economics wax eloquent about the intersection of supply and demand curves for endless weeks in basic economics courses while spending but a bare moment discussing what happens to markets when entire curves shift right or left (as the result, for example, of war, technological innovation, shifts in taste, or price shifts in substitute goods.) In the real world, of course, rightward and leftward shifts in supply and demand functions are the primary jeopardy to which business is subject. Bonds can be wiped out by inflation; land values can be destroyed by depression; common stocks can be devalued by international competition that eliminates barriers to entry and destroys oligopolies; and, a "balanced" portfolio does little for a person in a country ravaged by a shooting war. [Emphasis added.]
Morgan Stanley, 194 W.Va. at 174 n. 24, 459 S.E.2d at 917 n. 24.
The point to be made, of course, is that ultimately all investmentsespecially government bondsbear some risk. It's just that in different investment vehicles the risks are different: in stocks the risk is of a stock market crash followed by a depression; in bonds the risk is of inflation.
If I were managing a pension fund and not my own portfolio, I would keep some substantial part of the pension fund assets in bonds simply because I would then be covered if I am wrong about the risk of inflation versus the risk of depression. And, indeed, that is what the legislature did in W.Va.Code 12-6-9(j) [1990]; the legislature did not direct the Board to invest all of the money in the consolidated pension fund in common stocks, but simply authorized investment of up to 20 percent in common stock.
Opponents will argue, of course, that Code 12-6-9(j) [1990] is simply the camel's nose under the tent, and that eventually much larger proportions of the fund would be invested in stocks. But for my money it's a nice camel and the legislature is perfectly capable of determining just how much tent it wants to share with that particular camel. At the end of the day, I should repeat, it is *542 the legislature and the taxpayersnot the pension fundsthat must come up with the money to pay employee pensions. See Booth, supra.
The reason that I take the time to write this dissent is that I believe that the legislature should try again; new courts mean new law! This time, however, I would not give the Board general discretion to invest in listed stocks, but rather would authorize the Board to purchase only a Dow Jones Industrial Average index fund whose value is linked directly to the Dow Jones Industrial Average. This would allow investment in something that has a proven track record going back well before the Great Depression and, as a long term investment, looks almost as secure as a bond for capital safety while giving a much higher overall long term returna proposition vindicated by history. Furthermore, such a statute would not look like a camel's nose under the tent because a new court could carve a narrow exception under W.Va. Const. Art. X, § 6 that would allow continuing court review of any further liberalizationa technique similar to the one we adopted in the recent bond cases. See State ex rel. Lawrence v. Polan, 192 W.Va. 629, 453 S.E.2d 612 (1994) (park development revenue bonds violate W.Va. Const. because the park system operates at a deficit and the only way the bonds could be liquidated is from the state general revenue fund); State ex rel. Marockie v. Wagoner, 190 W.Va. 467, 438 S.E.2d 810 (1993) (School Building Authority bonds to be liquidated by dedicating a portion of existing consumer sales tax, a general revenue tax, created a new state debt in violation of W.Va. Const.); Winkler v. State School Bldg. Authority, 189 W.Va. 748, 752, 434 S.E.2d 420, 424 (1993) (School Building Authority bonds to be liquidated by a "building capital improvement fund ... `created in the state treasury'" violate W.Va. Const.); State ex rel. Clarksburg Mun. Bldg. Com'n v. Spelsberg, 191 W.Va. 553, 447 S.E.2d 16 (1994) (lease agreement between City of Clarksburg and Clarksburg Municipal Building Commission to finance a new municipal building through the issuance of bonds without voter approval, and allowing the Building Commission to lease the building to the City using the monthly rental payments to retire the bonds, does not violate W.Va. Const. Art X, § 8 or W.Va.Code 11-8-26 when the amount to be repaid is limited by the pre-determined cost of the building and it is clear that the agreement imposes no legal obligation on the City to make appropriations to be used to pay for the bonds); State ex rel. Marockie v. Wagoner, 191 W.Va. 458, 446 S.E.2d 680 (1994) (school building debt service fund to be liquidated by funds allocated from the net profits of the West Virginia Lottery does not violate W.Va. Const. Art. X, § 4, since the designated lottery profits constituted a new revenue source, and W.Va. Code 29-22-18 specifically provided that net profits from West Virginia Lottery not be treated as part of the general revenue of the State); Bd. of Educ. of County of Hancock v. Slack, 174 W.Va. 437, 327 S.E.2d 416 (1985) (issuance of refunding bonds to retire existing bonds do not create a new debt and, therefore, voter approval is not needed and this refunding plan is lawful).
NOTES
[1] Mr. Gainer is a member of the Board pursuant to statute. See W.Va.Code § 12-6-3(a) (1991).
[2] West Virginia Code § 12-6-9(j) grants the Board authority to invest pension funds in: "[a]ny corporate stock of any private corporation or association organized and operating in the United States and which is also listed on the Standard and Poor's List of 500."
[3] The attorney general's opinion was issued in response to a specific request posed by Larrie Bailey, State Treasurer, on May 12, 1993. Mr. Bailey is a Board member pursuant to West Virginia Code § 12-6-3(a).
[4] The Louisiana decision began in similar fashion to the case before us after an attorney general's opinion was issued declaring the unconstitutionality of investing public employee's retirement funds in accordance with a specific legislative enactment. See 423 So.2d at 74.
[5] Oregon, however, has a statute which expressly declares that "`the State of Oregon and other public employers' have no proprietary interest in the Public Employe[e]s' Retirement Fund...." Sprague, 252 Or. at 522 n. 9, 451 P.2d at 57 n. 9 (emphasis omitted). The Oregon court further relied on the lack of specific legislative intent demonstrating that "it was the intention of the people in adopting Article XI, § 6 not only to avoid the loss of the state's assets but also to pronounce, in effect, the state's duty as trustee in dealing with the property of others." Id. at 522-23, 451 P.2d at 57. Sprague is easily distinguished given this state's lack of comparable legislation declaring the state's lack of a proprietary interest in the PERS combined with our prior enunciation in Dadisman of the fiduciary obligations imposed on the state in connection with investment of PERS funds. See 181 W. Va. at 794-95, 384 S.E.2d at 831-32 and syl. pt. 25.
[6] The Indiana Constitution states that "nor shall the State hereafter become a stockholder in any corporation or association." Ind. Const. art. XI, § 12, in part.
[7] The statutory language authorizing such investment provided that the Board could invest funds "`in bonds of public utilities and private corporations with a recognized bond guide rating of at least A and which meet requirement for investment of reserves of domestic life insurance companies.'" Day, 197 Va. at 784, 91 S.E.2d at 663.
[8] At least one state has amended their state constitutional prohibition against state involvement in corporate stock to create an express exception for retirement or pension benefits of public employees. In 1978, Michigan revised article 9, section 19 of its 1963 constitution which had read: "The state shall not subscribe to, nor be interested in the stock of any company, association or corporation." The applicable language inserted provides, in addition to the foregoing, "except that funds accumulated to provide retirement or pension benefits for public officials and employees may be invested as provided by law[.]" Mich. Const. art. 9, § 19.
[9] Attached as Exhibit A to the Appellee's brief was documentation submitted for the proposition that had the Board been involved in equity investments as of May 1993, the market value of the consolidated investment fund portfolio would have been $19,517,920.92 greater by the end of 1994.
[1] It was a majority, but barely. An effort to delete from Section 6 the prohibition on state investment in private corporations and persons failed by a scant vote of 22-21, largely along sectional lines. 3 Debates and Proceedings of the First Constitutional Convention of West Virginia 247 (1861-1863). Indeed, those favoring investment (primarily delegates from the undeveloped southern counties) achieved a late convention compromise for inclusion in the finance article of the following section, which seriously limited the impact of Section 6:

"If the State become a stockholder in any association or corporation for purposes of internal improvement, such stock shall be paid for at the time of subscribing, or a tax shall be levied for the ensuing year, sufficient to pay the subscription in full."
3 Debates and Proceedings of the First Constitutional Convention of West Virginia at 878. It is significant that the 1872 convention dropped the Section 7 compromise but retained Section 6 in full force. That fact is even more remarkable given that the 1872 convention was dominated by ex-Confederates, most of whom came from those portions of the State that in 1863 most needed and therefore sought investment in internal improvements.
[2] See, e.g., Remarks of Delegate Dering, 3 Debates and Proceedings of the First Constitutional Convention of West Virginia at 201:

"It would be ruinous to the State if we should agree to strike out `corporations or person' in this section and thereby authorize the legislature to loan the credit of the State to corporations or individuals. What is a corporation? A soulless thing organized to make money for its projectors without regard to any other purpose. The gentleman from Doddridge and other gentlemen here want to lend and pledge the credit of the State to these soulless corporations, to cities and towns, corporations and persons. He proposes to incorporate in our organic law an invitation for all time to come for adventurers and cheats and companies organized for all sorts of questionable purposes throughout the whole country to come in and lay siege to our treasury and empty its coffers."
[3] I do not mean to imply a positionone way or anotherregarding the desirability of such an amendment. Certainly, recent experiences in this State, see State v. Morgan Stanley & Co., Inc., 194 W.Va. 163, 459 S.E.2d 906 (1995), and in Orange County, California, indicate that we need, at a minimum, safeguards against officials who seek to reap big profits through speculative investments of public funds. Whether and what safeguards are sufficient are matters beyond our domain.
[1] I always keep some U.S. Savings Bonds on hand for near cash. This is simply to cover unforeseen circumstances such as a car conking out. Other members of my family also hold a few bonds for liquidity, but none holds bonds for investment.
[2] I so strongly believe in this number that automatic rent increases of five percent a year is what I insert into commercial leases when I am the landlord, and it is the inflation factor to which I acceded when I recently negotiated for law offices in Charleston.
[3] "For the kingdom of heaven is as a man travelling into a far country, who called his own servants, and delivered unto them his goods. And unto one he gave five talents, to another two, and to another one; to every man according to his several ability; and straightway took his journey. Then he that had received the five talents went and traded with the same, and made them other five talents. And likewise he that had received two, he also gained other two. But he that had received one went and digged in the earth, and hid his lord's money. After a long time the lord of those servants cometh, and reckoneth with them. And so he that had received five talents came and brought other five talents, saying Lord, thou deliveredst unto me five talents: behold, I have gained bedside them five talents more. His lord said unto him, Well done, thou good and faithful servant: thou hast been faithful over a few things, I will make thee ruler over many things: enter thou into the joy of thy lord. He also that had received two talents came and said, Lord, thou deliveredst unto me two talents: behold, I have gained two other talents beside them. His lord said unto him, Well done, good and faithful servant; thou hast been faithful over a few things, I will make thee ruler over many things: enter thou into the joy of thy lord. Then he which had received the one talent came and said, Lord, I knew thee that thou art an hard man, reaping where thou hast not sown, and gathering where thou hast not strawed: And I was afraid, and went and hid thy talent in the earth: lo, there thou hast that is thine. His lord answered and said unto him, Thou wicked and slothful servant, thou knewest that I reap where I sowed not, and gather where I have not strawed: Thou oughtest therefore to have put my money to the exchangers, and then at my coming should have received my own with usury. Take therefore the talent from him, and give it unto him which hath ten talents. For unto every one that hath shall be given, and he shall have abundance: but from him that hath not shall be taken away even that which he hath." Matthew 25:14-29 (King James).
[4] Unless, of course, the Board has taken very low yields by buying only short term notes so that when inflation pushes interest rates up (if the Federal Reserve allows interest rates to go up) the Board can take advantage of new, higher interest rates.