## CIRCUIT COURT OF AMHERST COUNTY

Orion Sporting Group, L.L.C.

v.

Nelson County
Board of Supervisors

June 29, 2005

Case Nos. (Chancery) 04-0019, 04-0020

BY JUDGE J. MICHAEL GAMBLE

I am writing to give the decision of the court in this case. First, I find that the Nelson County Board of Supervisors ("Board") has not violated the constitutional right to hunt of Orion Sporting, L.L.C. ("Orion"). Specifically, I find that the operation of a shotgun sports center or sporting clays facility is not a constitutionally protected right under the constitutional right to "hunt, fish, and harvest game" in Article XI, § 4, of the Constitution of Virginia. Next, I find that a shotgun sports center and/or sporting clays facility is not a use permitted by right or an accessory use to a hunting preserve under the Nelson County Zoning Ordinance. My reasons for these rulings are set forth below.

The court must determine the meaning of the constitutional right to "hunt, fish, and harvest game" in the amendment to the Constitution of Virginia effective on January 1, 2001. In particular, the court must determine whether a sporting clays facility, shotgun sports center, or shooting sporting clays is a constitutionally protected activity under Article XI, § 4, of the Virginia Constitution. There has been much discussion in the briefs and arguments about the burden of proof required to establish whether the activity comes within the constitutional protection. Neither party can "prove" the meaning of a constitutional provision. This meaning must be

interpreted and found by the court as a matter of law. The court, of course, must consider any relevant facts and legal analysis offered by the parties on this issue. The defendant has suggested that the plaintiff must overcome a presumption of validity resulting from the Board's action denying the conditional use permit. The Board cites authority that a governing body's passage and interpretation of zoning ordinances are legislative actions that carry a presumption of validity. *Ames v. Town of Painter*, 239 Va. 343, 347 (1990); *Board of Supervisors v. Carper*, 200 Va. 653, 660 (1959). Under this analysis, a party seeking to invalidate the decision of a local governing body must produce evidence that the decision was unreasonable, and, once evidence of unreasonableness has been produced, the burden shifts to the governing body to support the reasonableness of its decision. However, once this burden has shifted to show reasonableness, a governing body has the burden of showing only that the issue was "fairly debatable." *Fairfax Co. v. Snell Corp.*, 214 Va. 655, 659 (1974).

The "reasonableness" and "fairly debatable" analysis is not applicable to the determination of constitutional rights in the instant case. Zoning decisions are legislative decisions. *Bollinger v. Roanoke County*, 217 Va. 185, 186 (1976). A zoning action by a local governing body only carries a presumption of validity when there is legislative action by the local governing body. *Fairfax Co. v. Southland Corp.*, 224 Va. 514, 522 (1982).

There was no legislative action of the Nelson County Board of Supervisors on the issue of whether the shotgun sports center or the sporting clays facility was a constitutionally protected right of Orion. The transcript of the proceedings before the Board of Supervisors on the conditional use permits does not disclose that there was any discussion about the constitutional right. Thus, there was no legislative action by the Board of Supervisors on a constitutional issue that carries a presumption of validity requiring a reasonableness analysis.

Accordingly, the court must determine the meaning of Article XI, § 4. There are certain rules of construction to be applied. The Supreme Court of Virginia has stated that, with respect to constitutional interpretation "every word in it should be expounded in its plain, obvious, common sense." *Farinholt v. Lukhard*, 90 Va. 936, 937 (1886). In *Farinholt*, the court determined the definition of the term "laboring person" under the homestead exemption granted by the Constitution of Virginia. In this process, it defined the word "laborer" in "its ordinary and usual acceptation." *Id.* at 938.

The Supreme Court of Virginia has further stated that "The constitution must be viewed and construed as a whole, and every section,

phrase, and word given effect and harmonized if possible." *Dean v. Paolicelli*, 194 Va. 219, 227 (1952). If there is some doubt as to meaning of words or phrases in the constitution, "their contemporaneous and practical consideration are significant and may be resorted to for aid in determining their meaning." *Id.* at 227. Further, in construing a constitution or any clause thereof "a court should look to the history of the times and examine the state of things existing when . . . adopted. . . ." *Almond v. Day*, 197 Va. 782, 787 (1956).

I agree with the plaintiff that the constitutional right to hunt, fish, and harvest game under the Constitution of Virginia is a fundamental right. This right, just as all constitutional rights, does have limitations. It is not limitless, infinite, and without bounds. Even our greatest federal constitutional rights such as freedom of speech, freedom of the press, and freedom of assembly have limitations. So, does a shotgun sporting center and/or sporting clays facility come within the constitutional protection to hunt, fish, and harvest game?

While it is not a controlling precedent in this case, it is helpful to examine hunting rights in the context of our common law heritage. In common law, a grant of a right to kill and take game was a grant of an interest in the land itself. It was deemed a *profit a prendre*. These were rights exercised by one man in the soil of another. *Bingham v. Salene*, 15 Ore. 208, 211-12, 14 P. 523, 524 (1887). Quoting Lord Chancellor Campbell, the Supreme Court of Oregon said: "the property and animals *ferae naturae*, while they are on the soil, belong to the owner of the soil." *Id.* 15 Ore. at 212, 14 P. at 524. The Supreme Court of Florida stated that the right of hunting "is an incorporeal right growing out of the soil." *Alford v. Finch*, 155 So. 2d 790, 792-93 (1963). Likewise, the Supreme Court of Alabama has described the right to hunt on the land of another as a *profit a prendre*. The Alabama court defined this as a right "exercised by one man in the soil of another . . . or a right to take part of the soil or of the produce of the land." *Reeves v. Alabama Land Locators, Inc.*, 514 So. 2d 917, 918 (1987). *See also Bedingfield v. Echo Enterprises, Inc.*, 283 S.C. 561; 324 S.E.2d 312 (1984).

The common law right to hunt was deemed a property right in the real estate. Game was deemed to be something that was produced by the soil of the land. Thus, hunting was viewed as something that involved the taking of the produce of the land.

In this case, the construction and interpretation of the right to "hunt, fish, and harvest game" under Article XI, § 4, of the Virginia Constitution requires that the word "hunt" be defined. While as noted above, every word

in a constitutional provision should be expounded in its plain, obvious, and common sense, the real issue in this case involves the definition of the word hunt. The word "fish" is not involved in this case. No part of Orion's activities are fishing. The meaning of "harvest game" is not involved in this case because the activity of shooting sporting clays does not involve either harvesting or game. The word harvest basically means to gather. *Webster's Concise Dictionary* (1997). Game is defined as wild birds or animals pursed or caught for sport or profit. *Webster's Concise Dictionary* (1997). Thus, utilizing the rules of construction discussed above, the court must determine the plain, obvious, and common sense meaning of the word hunt. Further, as noted in *Almond v. Day*, the court must look at this issue in the context of things existing when this provision was adopted. *Id.* at 787.

In 1919, the Supreme Court of Virginia defined the word "hunting" in the context of a case where the defendant was charged with hunting without a license. *Commonwealth v. Bailey*, 124 Va. 800 (1919). Citing 1 *Bouvier's Law Dictionary*, hunting was defined as "the act of pursuing and taking wild animals, the chase." Citing *Webster's International*, the word "hunt" was defined as "[T]o search for or follow after, as game or wild animals; to chase; to pursue for the purpose of catching or killing; to follow with dogs or guns for sport or exercise; as, to hunt a deer. To follow the chase; to go out in pursuit of game; to course with hounds." Citing the *New Standard Dictionary of the English Language*, the word "hunt" was defined as "to pursue for the purpose of killing or catching; as to hunt the lion; to take part in the chase for sport or exercise; as, to hunt the fox; to go in pursuit of wild animals or feather." *Id.* at 802. Additionally, it is interesting to note that the court stated that it is a fundamental rule of statutory construction that words "are to be given their natural and ordinary meaning, unless it plainly appears that they are used in some other sense." *Id.* at 803.

In 1952, the Supreme Court of New Jersey sought to define the term "hunting" in the context of illegally hunting deer. *State of New Jersey v. Meinken*, 10 N.J. 348, 91 A.2d 721 (1952). There, the court noted that, generally speaking, the term "hunting" is "the act of searching for, pursuing, or chasing game." *Id.* 10 N.J. at 353, 91 A.2d at 723. Likewise, in 1976, the United States Court of Appeals for the Ninth Circuit defined "hunting" to include "the search for and pursuit of game." *United States v. Sanford*, 547 F.2d 1085, 1091 (9th Cir. 1976). Further, in 2001, the United States District Court for the Western District of Virginia considered a case where the defendant was charged with illegally hunting in the Shenandoah National Park. *United States v. Jarrell*, 143 F. Supp. 2d 605 (2001). Citing

*Webster's Third New International Dictionary* 1103 (1961), the court held that "hunting" includes "searching for or pursuing wildlife with the purpose of killing, wounding, or capturing." *Id.* at 608.

In each of the cases cited above the words hunt or hunting have a common thread. The common thread is that the pursuit of game is essential to the definition of hunt or hunting. This is also reflected in current dictionary definitions. For instance, the *Merriam-Webster Collegiate Dictionary* (10th ed. 1995) defines hunt as "to pursue for food or in sport; to manage in the search for game; to pursue with intent to capture; to search out; to traverse in search of prey." The *New International Webster's Concise Dictionary of the English Language* (1997) defines the word "hunt" as "to pursue (game) for the purpose of killing or catching; to search for game; to search for diligently; to pursue game or other wild animals; follow the chase." *The Oxford American Dictionary of Current English* (1999) defines the word "hunt" as "pursue and kill (wild animals, esp. game); also in killing wild animals."

Case decisions from 1919 to 2001 together with current dictionary definitions point to the legal conclusion that the word "hunt" in its plain, obvious, and common sense means the pursuit of game. Shooting sporting clays is not the pursuit of game. It is essentially shooting at an inanimate object. Accordingly, shooting sporting clays does not qualify as hunting under the Virginia constitutional right to hunt, fish, and harvest game.

The plaintiff also argues that hunting "simulated game," such as sporting clays, is a constitutional right implied in or incident to the right to hunt granted by the Constitution of Virginia. Under this argument, the right to hunt necessarily includes the right to learn how to hunt and harvest game safely, proficiently, and humanely. The plaintiff maintains that shooting sporting clays is a continuum of activities within the constitutional right to hunt. As noted in the memorandum of the plaintiff, just as the right to free press includes the right to publish and sell newspapers, the right to hunt includes the right of hunters to shoot safely, proficiently, and humanely.

This argument fails because the commonly understood definition of the word "hunt" does not include proficiency, safety, or the humane hunting of game. The argument that the constitutional right to hunt implies a right to offer sporting clays services to those who wish to exercise that right simply is not within the commonly understood definition of the word hunt. Accordingly, the court cannot find that the shooting of sporting clays is fairly implied or incident to the constitutional right to hunt. Count Six of the appeal is dismissed.

The remaining issues are Count One and Count Two of the declaratory judgment action. Under Count One, it is alleged that the sporting clays shooting facility is one permitted by right in an A-1 zoning district. Under Count Two, it is alleged that the shooting clays sporting facility is an accessory use.

First, addressing Count One, the zoning ordinance in this case is an "inclusive" ordinance. Zoning ordinances are generally of two kinds, the inclusive type and the exclusive type. *Wiley v. Hanover County*, 209 Va. 153, 155 (1968). An inclusive type of ordinance specifies the uses that are permitted and an exclusive type of ordinance describes the activities that are not permitted. *Id.* at 155.

An examination of the provisions of the A-1 district in the Nelson County Zoning Ordinance discloses that it is an inclusive ordinance. Thus, only the enumerated permitted uses are allowed. The A-1 zoning district allows uses permitted by right, uses permitted by conditional use permit, and uses permitted by special permit. The uses permitted by right do not include a sporting clays facility. This is allowable only under a conditional use permit approved by the Board. Accordingly, under Count One, there is no by-right use permitted for a sporting clays facility. Count One of the declaratory judgment is dismissed.

The next issue is whether a sporting clays facility is an accessory use in an A-1 zoning district. Section 4-1-12 of the uses permitted by right in an A-1 district include "Accessory uses as defined." Section 2-2 of the ordinance defines an "Accessory use or structure" as "(A) subordinate use or building customarily incidental to and located upon the same lot occupied by the same use or building." Under the evidence, three main uses were proposed for this property. These are a corporate training facility, hunting preserve, and sporting clays facility. *See* Trial Trans., vol. III, p. 481. Morris Peterson, managing director of Orion, testified that the corporate training facility and the hunting preserve would be the largest profit centers for the facility. *See* Trial Trans., vol. III, pp. 534, 552. John Long, an insurance agent who specializes in insurance for hunting preserves, testified that approximately 80 to 90 percent of hunting preserves nationally have a sporting clays facility. *See* Trial Trans., vol. II, p. 277. Further, Orion maintains that it initially proposed an all-inclusive sporting estate that would include all three functions. According to Orion, it was only by Nelson County's insistence that separate applications were made for the corporate training facility and the shotgun sports center. Under this analysis, Orion maintains that Nelson County has required an artificial separation of what should be considered one entity that includes

a hunting preserve, corporate training facility, and sporting clays facility. *See* Trial Trans., vol. III, pp. 494-98.

At first blush, it seems that the sporting clays facility is a subordinate use customarily incidental to the hunting preserve. However, under the evidence, it is apparent that the sporting clays facility is a main use, if not the main use, of the property. Under the permit issued by the Department of Game and Inland Fisheries, the hunting preserve can only operate eight months per year (September to April). The sporting clays facility, however, can operate the entire year. As noted in the testimony of Mr. Peterson, the sporting clays facility is an alternative to hunting. Clients who do not want to engage in "blood sports" have the option of shooting sporting clays. *See* Trial Trans., vol. III, p. 484. Sporting clays is one of the most useful tools in attracting woman shooters according to Mr. Peterson. *See* Trial Trans., vol. III, p. 491. Also, as Mr. Peterson noted, the sporting estate is not feasible without the sporting clays course. In fact, he testified that his staff "has been dead still for 18 months" without the sporting clays course. *See* Trial Trans., vol. III, p. 495.

Under the testimony, it is clear that Orion intends for the sporting clays facility to be a different and alternative use. Further, it is an essential use for the success of the Orion project. Also, the sporting clays course covers a significant portion of the real estate west of the state road leading from Wingina to Norwood.

Generally, the question of whether an activity is an accessory use is a question of fact. *Wiley v. County of Hanover*, 209 Va. 153, 155 (1968). Under the evidence, I find that the sporting clays facility is a main use of the property in this case. It is a use that is equal to or superior to the hunting preserve or the corporate training facility because it is undertaken the entire year as an alternative to the hunting preserve.

The plaintiff cites *Boone Co. Area Plan Comm'n v. Kennedy*, 560 N.E.2d 692 (Ind. App. 1990), to support its contention that the sporting clays facility is an accessory use in an A-1 district under the Nelson County Zoning Ordinance. In *Boone*, the landowners wanted to build a recreational skeet and shooting range next to their weekend home. The landowners filed a declaratory judgment action requesting that the skeet and shooting range be declared an accessory use under the zoning ordinance. Both the trial court and appellate court agreed with the landowners. Ruling for the landowners, the Indiana Court of Appeals stated that "an accessory use must be subordinate in area, extent, and purpose to the primary use of the lot." *Id.* at 696. Further, the Indiana Court of Appeals noted that recreational uses are commonly associated

with country houses, and the skeet range is incidental to the recreational use of the weekend home. *Id*. at 697.

*Boone* is substantially different from the instant case. In the instant case, the extent and purpose of the planned sporting clays facility is not subordinate to any primary use. It is a primary use. It is not undertaken on weekends, it is an activity that can be undertaken all year, and it occupies a substantial portion of the real estate. Further, rather than an activity that is incidental to any main use, it is a primary activity that is alternative to so-called blood sport activities within the hunting preserve. Accordingly, the allegations in Count Two of the declaratory judgment are not supported by the facts. Count Two is dismissed as to the sporting clays facility.

Orion further maintains that Nelson County is trying to "approbate and reprobate." It asserts that Nelson County made it file separate applications for conditional use permits for the corporate training facility and the shooting facility rather than one application for a unified sporting estate that Orion wanted to file. This, according to Orion, resulted in Nelson County granting the corporate training center permit and denying the shooting facility. As a result, Orion argues that the Board is trying to use the situation it created to the disadvantage of Orion.

The approbate and reprobate argument fails because there is no proof that an application for a unified sporting estate would have prevailed. In order for this argument to succeed, some benefit to the Board must be proven. *Holston Corp. v. Wise County*, 131 Va. 142, 159 (1921). Without proof that Orion's unified application would have been granted by the Board, this argument has no evidentiary support.

While I have found that it has not been proven that the sporting clays facility, *per se*, is an accessory use, I do find that the use of sporting clays for warm-ups and safety tests in conjunction with hunts of live animals on the hunting preserve is an accessory use. The facts establish that this limited use of sporting clays is customary to allow a hunter to warm-up prior to engaging in a hunt of wild game and for the staff and guides to evaluate the proficiency of the hunter for safety purposes. Thus, and for this limited purpose, the shooting of sporting clays is allowed as an accessory use. Accordingly, while a sporting clays facility is not an accessory use under the Nelson County Zoning Ordinance to a hunting preserve, shooting of sporting clays, or for that matter skeet or trap, is subordinate and incidental to the hunting preserve for purposes of warm-ups and safety evaluations.